Deborah COLBETH, on behalf of herself and all others similarly situated

v.

David WILSON, in his official capacity as Commissioner of the Vermont Department of Social Welfare.

Civ. A. No. 80–317.

United States District Court, D. Vermont.

Sept. 22, 1982.

On Renewal Motion for Summary Judgment Dec. 14, 1982.

**540**

Wendy Morgan, Vermont Legal Aid, Inc., St. Johnsbury, Vt., for plaintiff.

Michael McShane, Asst. Atty. Gen., Vermont Dept. of Social Welfare, Montpelier, Vt., for defendant.

## OPINION AND ORDER

COFFRIN, District Judge.

In this civil action, plaintiff, on behalf of herself and others similarly situated, seeks declaratory and injunctive relief against defendant David Wilson in his official capacity as Commissioner of the Vermont Department of Social Welfare. Plaintiff contends that defendant's interpretation and implementation of the Vermont Food Stamp Manual violates her rights under the Food Stamp Act of 1964, as amended, 7 U.S.C. §§ 2011–2029 (1976 & Supp. IV 1980) its accompanying regulations, and the Fourteenth Amendment to the United States Constitution. Jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1337, 1343(a)(3) (Supp. IV 1980). Plaintiff further alleges that the court has pendent jurisdiction over her statutory claims. Finally, plaintiff asserts that her requests for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201, 2202, (1976 & Supp. IV 1980) and 42 U.S.C. § 1983 (Supp. IV 1980). This court granted plaintiff's Motion for Class Certification on December 14, 1981.[1]

Defendant generally denies the allegations set forth in the complaint. Defendant also submits that this court lacks jurisdiction over the subject matter,[2] plaintiff fails to state a claim upon which relief can be granted, and the claims are barred by operation of the Eleventh Amendment to the

1. The class, certified pursuant to Fed.R.Civ.P. 23(a) and 23(b)(2), is defined as

"[a]ll past [or] present . . . recipients of [Aid to Needy Families with Children] benefits from the Vermont Department of Social Welfare, who had or currently have earned income and who, in the computation of their ANFC grant, have received or currently receive deductions from their earned income for employment-related transportation and child care expenses pursuant to Welfare Assistance Manual §§ 2253.3(d) and (i) and who have applied or will apply for food stamp benefits from the Department.

2. We reject defendant's contention that this court lacks subject matter jurisdiction over the case at bar. The Federal Question Jurisdictional Amendments Act of 1980, Pub.L. 96–486, 94 Stat. 2369, effective December 1, 1980, eliminated the amount in controversy requirement for federal question jurisdiction under 28 U.S.C. § 1331. Plaintiff filed the instant action on December 5, 1980, and alleges claims arising under the laws (Food Stamp Act and Social Security Act) and Constitution (Fourteenth Amendment) of the United States. According-

ly, the Court has federal question jurisdiction under 28 U.S.C. § 1331, and pendent jurisdiction over the remaining claims. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Furthermore, this court has jurisdiction over the action pursuant to 28 U.S.C. § 1337 since plaintiff asserts rights under the Food Stamp Act, which is an Act regulating commerce. *Carter v. Blum,* 493 F.Supp. 368, 370 n. 5 (S.D.N.Y.1980).

We also note that, in cases of this nature that arose prior to the amendments to 28 U.S.C. § 1331, the courts recognized jurisdiction under 28 U.S.C. § 1343 where plaintiff alleged a "substantial" Constitutional claim under 42 U.S.C. § 1983. Thus having established jurisdiction, the courts exercised pendent jurisdiction over claims that State standards conflicted with federal statutes and regulations. *See, e.g., Quern v. Mandley,* 436 U.S. 725, 729–30 n. 3, 98 S.Ct. 2068, 2071–72 n. 3, 56 L.Ed.2d 658 (1978); *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). In light of the date of filing of the action at bar, we need not adopt the latter mode of establishing jurisdiction.

U.S. Constitution. The case is now before this court on cross-motions for summary judgment.

*Background*

The Department of Agriculture, pursuant to the Food Stamp Act of 1964, instituted a food stamp program. The purpose of the original Act has been characterized as bifurcated, with equal emphasis upon enhancing the agricultural economy and raising levels of nutrition among low-income families. *United States Department of Agriculture v. Murry,* 413 U.S. 508, 514, 93 S.Ct. 2832, 2835, 37 L.Ed.2d 757 (1973) (Stewart, J., concurring); H.R.Rep. No. 345, 95th Cong., 1st Sess. 422–23, *reprinted in* 1977 U.S.Code Cong. & Ad.News 1704, 2350–51 [hereinafter, "1977 U.S.Code Cong. & Ad. News at ——."] The revised declaration of policy inserted into the Act in 1977 "place[d] the anti-hunger policy in a paramount position and ... downgrade[d] the disposition of [agricultural] surpluses as a program goal." 1977 U.S.Code Cong. & Ad. News at 2350–51.

Under the original Food Stamp Act, the States determined food stamp eligibility. The federal government only required that State standards be consistent with those adopted by the State for use in conjunction with other federally aided public assistance programs. 1977 U.S.Code Cong. & Ad. News at 1987. The 1971 amendments, however, substantially modified the Act. By means of the amendments, Congress vested in the Secretary the authority to establish uniform national standards of eligibility for participation by households in the food stamp program. Food Stamp Act—Amendments of 1971, Pub.L. No. 91–671, 84 Stat. 2048 (1971), *cited in Compton v. Tennessee Department of Public Welfare,* 532 F.2d 561, 563 (6th Cir.1976). Federal standards, comprised of income eligibility, resource (assets) eligibility, and work registration requirements, were substituted for the State criteria. Food stamp eligibility became predicated upon the finding that an applicant household's anticipated monthly income was less than the amount that would allow it to purchase a nutritionally adequate diet when spending not more than 30 percent of its available income. The income eligibility limits thus focused upon the household's net income, an artificial concept based upon a definition of income that included certain payments received by or made on behalf of household members, excluded other such payments, and was further adjusted by the subtraction of various deductions. 1977 U.S.Code Cong. & Ad. News at 1987, 1995.

Congress again revised the Act in 1977. Food Stamp Act of 1977, Pub.L. No. 95–113, §§ 1301–1304; 91 Stat. 958 (1977). "The old system of Secretarial discretion within the parameters of Congressional goals [was] abandoned in favor of Congressionally set income limitations implementing the broadly-stated Congressional goal," namely, to facilitate participation in the food stamp program of households whose incomes substantially limited their ability to obtain a nutritious diet. 1977 U.S.Code Cong. & Ad. News at 1995.

The 1977 amendments also eliminated the previous program requirement that eligible households purchase food stamps, and in its stead established a system whereby households received an allotment of stamps. Household income remained the predicate for eligibility and, in its definition of income, Congress "cast the broadest possible net," encompassing "all income from whatever source derived." 1977 U.S.Code Cong. & Ad.News at 2001. *See Carter v. Blum,* 493 F.Supp. 368, 370–71, 371 n. 8 (S.D.N.Y. 1980). In lieu of the various itemized deductions previously allowed by the Secretary, Congress established a standardized deduction as well as certain limited deductions designed to serve as work incentives and to equalize the circumstances of working and nonworking households. 1977 U.S. Code Cong. & Ad.News at 2037. Included in the latter category of deductions were a 20 percent earned income deduction and a dependent care deduction with a stated ceiling. *Id.* at 2045, 2393. Relatedly, the amended Act made provision for program-related monetary allowances for such expenses as travelling or training; unless oth-

erwise excluded by law, the allowances were included in income, but thereafter excluded under the reimbursement exclusion provision of the amended Act. *Id.* at 2003–04. In so proceeding, Congress remained true to its expansive definition of income, yet accommodated its concern for preserving work incentives.

The statutory provision at issue in the instant case is 7 U.S.C. § 2014, which establishes exclusions from income in the assessment of eligibility for food stamps. In particular, we are concerned with section 2014(d)(5), which, from the time of the 1977 amendments until subsequent to the filing of this suit, excluded "reimbursements which do not exceed expenses actually incurred and which do not represent a gain or benefit to the household." Also of relevance is 7 C.F.R. § 273.9(c)(5) (1982), which defines excluded income. Section 273.-9(c)(5) of the Vermont Food Stamp Manual is identical to 7 C.F.R. § 273.9(c)(5).

Subsequent to the filing of this action, Congress amended 7 U.S.C. § 2014(d)(5) to exclude from household income "reimbursements which do not exceed expenses actually incurred and which do not represent a gain or benefit to the household: *Provided, that no portion of benefits provided under title IV–A of the Social Security Act, to the extent it is attributable to an adjustment for work-related or child care expenses, shall be considered such reimbursement* . . . ." 7 U.S.C.A. § 2014(d)(5) (West Supp. 1982) (emphasis added). Title IV–A of the Social Security Act is the Aid to Families with Dependent Children (AFDC) section of the Act, which appears at 42 U.S.C.A. §§ 601–615 (West 1974 & Supp.1982).

Plaintiff filed application for food stamp benefits with the State Department of Social Welfare (DSW) in September 1980. Later that month, DSW issued a Notice of Decision denying the application on the ground that plaintiff's income was in excess of DSW standards. Factored into the computation of plaintiff's income for purposes of determining her eligibility for food stamp benefits was a figure representing her monthly AFDC grant. The AFDC grant was computed on the basis of plaintiff's gross income less allowable deductions for employment-related child care and transportation expenses. Once plaintiff's net income was determined for purposes of AFDC calculations, however, the AFDC grant was increased by the exact amount of the total allowable deduction for child care and transportation expenses.

When considering plaintiff's eligibility for food stamp benefits, DSW included in its computation of income the full amount of the AFDC grant; that is, DSW recognized no exclusion of the amount representing child care and transportation expenses by which the AFDC grant had been increased. This calculation procedure rendered plaintiff ineligible for food stamp benefits. Defendant concedes that plaintiff would have been eligible for a food stamp allotment if the amount by which her AFDC grant was augmented as a result of the deductions had been considered as an exclusion from income for purposes of the food stamp program.

DSW did exclude from plaintiff's gross income certain child care and transportation subsidies that plaintiff received from non-AFDC sources. Pursuant to a provision of the State Welfare Assistance Manual, the Vermont Department of Social and Rehabilitative Services (SRS) furnished certain additional child care costs on behalf of persons such as plaintiff. DSW excluded these monies from gross income in the determination of plaintiff's eligibility for food stamp allotments. Similarly, plaintiff received monies for transportation costs incurred in conjunction with her enrollment in a Work Incentive Program. DSW also excluded these monies from plaintiff's income in the determination of her eligibility for food stamp benefits.

This case requires us to examine the interaction of the eligibility calculation provision of the AFDC statute and that section of the Food Stamp Act that provides for the exclusion from household income of specified "reimbursements." Plaintiff contends that the employment expense deductions mandated by the AFDC statute, which

serve to increase an AFDC grant to compensate recipients for such expenses, are "reimbursements" and therefore should be excluded from consideration as income for purposes of determining food stamp eligibility. The defendant argues that income that is part of an AFDC grant is not a "reimbursement." Accordingly, the fundamental issue is whether commuting and child care expenses for which a recipient is compensated by an AFDC grant must be characterized as "reimbursements" within the meaning of the Food Stamp Act.

An exhaustive analysis of AFDC provisions is not required under the circumstances of this case, as our primary interest is in section 2014(d)(5) of the Food Stamp Act. An abbreviated review of the AFDC program, however, is of assistance in understanding the issue at hand.

The AFDC program is designed to provide aid in the form of cash assistance and social services to needy, dependent children and the parents or relatives who live with and care for them. A key element of the program is to help such parents and relatives "to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection. . . ." 42 U.S.C. § 601 (1976).

The AFDC program is based upon "a scheme of cooperative federalism." *Shea v. Vialpando,* 416 U.S. 251, 253, 94 S.Ct. 1746, 1750, 40 L.Ed.2d 120 (1974) (quoting *King v. Smith,* 392 U.S. 309, 316, 88 S.Ct. 2128, 2133, 20 L.Ed.2d 1118 (1968)). It is financed in large part by federal funds, but administration of the program is assigned to the States. *Jacquet v. Westerfield,* 569 F.2d 1339, 1340 (5th Cir.1978). Each State plan "must specify a statewide standard of need, which is the amount deemed necessary by the State to maintain a hypothetical family at a subsistence level." *Shea,* 416 U.S. at 253, 94 S.Ct. at 1750. In Vermont, the AFDC program is known as Aid to Needy Families with Children (ANFC).[3]

Until the 1981 amendments to Title IV–A, calculation of an AFDC grant might also be influenced by 42 U.S.C. § 602(a)(7) (1976 & Supp. IV 1980), which provided that a State, in determining need, must take into consideration "any expenses reasonably attributable to the earning of . . . income." Such expenses were deducted from an applicant's income in the process of determining eligibility for assistance. *Shea,* 416 U.S. at 252, 94 S.Ct. at 1749.

The history of 42 U.S.C. § 602(a)(7) is recounted in the *Shea* opinion. Under the predecessor of the AFDC program, recipient families with working members incurred employment-related expenses that reduced available income yet were not accounted for by the States in determining eligibility for benefits. Accordingly, as part of the 1962 amendments to the Social Security Act, Congress established a provision whereby such employment expenses were acknowledged. The intent behind the adoption of the provision was clear: to encourage AFDC recipients to secure and retain employment by elimination of the disincentive attributable to nonrecognition of employment expenses. *Id.* at 259–60, 264, 94 S.Ct. at 1753, 1755.

The procedure whereby a State calculated eligibility for purposes of the AFDC program was thus distinguishable from eligibility determinations under the food stamp program in one crucial respect. By virtue of 42 U.S.C. § 602(a)(7), Congress mandated that a State undertake individualized consideration of an applicant's available income and resources. Consequently, a State could not establish a standard deduction for work-related expenses where the procedure precluded an applicant from demonstrating expenses in excess of that standard. *Shea,* 416 U.S. at 261–63, 265, 94 S.Ct. at 1754–55, 1756. In contrast, the Food Stamp Act contained no counterpart to 42 U.S.C. § 602(a)(7), and could countenance a standard deduction as opposed to individualized consideration of employment expenses. *Knebel v. Hein,* 429 U.S. 288, 294 n. 13, 97 S.Ct. 549, 553 n. 13, 50 L.Ed.2d 485 (1977).

**3.** *See Smith v. Pierce,* No. 80–344 (D.Vt. June 29, 1982).

In 1981, Congress amended Title IV–A.[4] The legislative history of the amendment notes that, under the (pre-1981 amendment) law, in determining AFDC benefits, the States were required to disregard from the recipient's total income (1) the first $30 earned monthly plus one-third of additional earnings and (2) any expenses (including child care) reasonably attributable to the earning of any such income. The 1981 amendment standardized the work expense disregard at $75 per month, capped the child care disregard at $160 per month, and applied the income disregards for recipients in the following order: (1) the first $75 of the family's earned income (*in lieu of itemized work expenses*); (2) then, the cost of care for a child, up to $160 per child monthly; and (3) finally, $30 plus one-third of the remainder of earned income (not already disregarded).[5] S.Rep. No. 139, 97th Cong., 1st Sess. 435, *reprinted in* 1981 U.S.Code Cong. & Ad.News 396, at 701. *See* 42 U.S.C. §§ 602(a)(7), 602(a)(8). In sum, one effect of the 1981 amendments to Title IV–A is to eliminate that clause of 42 U.S.C. § 602(a)(7) which required individualized assessment of income and, thus, employment expenses.

*Analysis*

In the original complaint, plaintiff sought retroactive as well as prospective relief. At a hearing held on September 2, 1982, plaintiff withdrew the claim for prospective relief in view of the substantive changes effectuated by the December 1981 amendment to the Food Stamp Act. Accordingly, plaintiff asks this court to recalculate eligibility for, and make restitution of, benefits due and owing the class prior to the effective date of the amendment to 7 U.S.C. § 2014(d)(5). In the alternative, plaintiff requests that this court direct defendant to issue to class members the form of notice sanctioned in *Quern v. Jordan,* 440 U.S. 332, 334, 99 S.Ct. 1139, 1141, 59 L.Ed.2d 358 (1979), so as to apprise them of their potential eligibility for retroactive relief. Defendant asserts that the claim for retroactive benefits is barred by principles of sovereign immunity as exemplified by the Eleventh Amendment, in light of the impact that payment of administrative costs incidental to the benefits would have upon the State treasury. Defendant contends that issuance of a *Quern* notice is precluded under a similar rationale.

We have carefully considered the arguments of the parties in the matter before us. For the following reasons, we conclude that the principles embodied in the Eleventh Amendment, as interpreted by recent decisions, bar any form of retroactive relief.

The federal government, through the Department of Agriculture pays 100 percent of food stamp benefits, and 50 percent or more of the administrative expenses associated with disbursement of benefits. *See* 7 U.S.C. §§ 2025, 2027; *Stewart v. Butz,* 491 F.2d 165 (6th Cir.1974); *Bermudez v. United States Department of Agriculture,* 490 F.2d 718 (D.C.Cir.), *cert. denied sub nom.,* 414 U.S. 1104, 94 S.Ct. 737, 38 L.Ed.2d 559 (1973); *Harrington v. Blum,* 483 F.Supp. 1015, 1021–22 (S.D.N.Y.1979), *aff'd mem.* 639 F.2d 768 (2d Cir.1980). Consequently, State agencies implement and administer the program but pay only the balance of administrative costs. Since the federal government is ultimately responsible for the payment of benefits, plaintiff's preferred relief, recalculation and restitution, is precluded only if the State's partial responsibility for administrative expenses may be characterized as a liability within the contemplation of the Eleventh Amendment.

---

4. In most instances, the effective date of the amendments is October 1, 1981. *See* Act Aug. 13, 1981, P.L. 97–35, Title XXIII, Subtitle A, ch. 1, § 2321, 95 Stat. 859.

5. The amendment allows the $30 and one-third disregard only during the first four consecutive months in which a recipient has earnings in excess of the standard work expense and child care disregards; thereafter, the amount of payment would be determined without benefit of the $30 and one-third disregard each month that the family continues to receive AFDC and for 12 consecutive months after AFDC is terminated. *See* 42 U.S.C. § 602(a)(8)(B)(ii); S.Rep. No. 139, 97th Cong., 1st Sess. 435, *reprinted in* 1981 U.S.Code Cong. & Ad.News at 701.

The Eleventh Amendment provides, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The language has been interpreted to bar a private party, citizen of the State in which the suit is brought, from invoking the jurisdiction of a federal court to impose upon the State a liability which must be satisfied out of State treasury funds. *Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974); *Hans v. Louisiana,* 134 U.S. 1, 10, 10 S.Ct. 504, 505, 33 L.Ed. 342 (1890). In appropriate circumstances, a federal litigant can obtain injunctive relief against a State officer, under the doctrine of *Ex Parte Young,* 209 U.S. 123, 155–56, 28 S.Ct. 441, 452, 52 L.Ed. 714 (1908). As clarified in *Edelman,* 415 U.S. at 663–65, 94 S.Ct. at 1355–56, however, *Ex Parte Young* allows suits for prospective relief only. Thus, the Eleventh Amendment precludes federal courts from granting retroactive relief in the nature of a monetary judgment. *See Quern,* 440 U.S. at 337, 99 S.Ct. at 1143 ("The distinction between relief permissible under the doctrine of *Ex Parte Young* and that found barred in *Edelman* [is] the difference between prospective relief on the one hand and retrospective relief on the other." (footnote omitted)); *Spicer v. Hilton,* 618 F.2d 232, 236–37 (3d Cir.1980); *Morrow v. Bassman,* 515 F.Supp. 587, 598 (S.D.Ohio 1981); *Heisse v. State of Vermont,* 519 F.Supp. 36, 44 (D.Vt.1980).

This court concludes that plaintiff's request for recalculation and restitution of food stamp benefits falls on the *Edelman,* rather than *Ex Parte Young,* side of the Eleventh Amendment law. *See Quern,* 440 U.S. at 347, 99 S.Ct. at 1148. Congress designed the Eleventh Amendment to " 'protect against federal judgments requiring payment of money that would interfere with the state's fiscal autonomy and thus its political sovereignty.' " *United Carolina Bank v. Board of Regents,* 665 F.2d 553, 560 (5th Cir.1982) (quoting *Jagnandan v. Giles,* 538 F.2d 1166, 1176 (5th Cir.1976)). Defendant's projections as to the magnitude of administrative expenses associated with the grant of retroactive relief indicate that such an award may demonstrably and significantly interfere with the State's budgetary process and thus its fiscal autonomy. *See Hutto v. Finney,* 437 U.S. 678, 692 n. 18, 98 S.Ct. 2565, 2574 n. 18, 57 L.Ed.2d 522 (1978); *Silva v. Vowell,* 621 F.2d 640, 653 n. 15 (5th Cir.1980), *cert. denied,* 449 U.S. 1125, 101 S.Ct. 941, 67 L.Ed.2d 111 (1981). The characterization of the anticipated expense as "administrative" or "ancillary" cannot control where the effect of according relief is that against which the Eleventh Amendment militates. *But see Harrington,* 483 F.Supp. at 1021–22; *Collins v. Marshall,* 507 F.Supp. 83, 86 (W.D.Mo.), *rev'd other grounds sub nom. Collins v. Donovan,* 661 F.2d 705 (8th Cir.1981).

We perceive a profound difference between informing the State Commissioner of Social Welfare that he must conform to federal standards in the future if the State is to have the use of federal funds and, on the other hand, ordering the Commissioner to use State funds to make reparation for past noncompliance with such standards. *Edelman,* 415 U.S. at 664–65, 94 S.Ct. at 1356–57 (citing *Rothstein v. Wyman,* 467 F.2d 226, 236–37 (2d Cir.1972), *cert. denied,* 411 U.S. 921, 93 S.Ct. 1552, 36 L.Ed.2d 315 (1973)). We must recall that " '[t]he right of the Federal Judiciary to summon a State as defendant and to adjudicate its rights and liabilities had been the subject of deep apprehension and of active debate at the time of the adoption of the Constitution.... " *Edelman,* 415 U.S. at 660, 94 S.Ct. at 1354 (quoting 1 C. Warren, *The Supreme Court in United States History* 91 (rev.ed.1937)). The Eleventh Amendment guards against undue interference by the federal judiciary in matters reserved to the States.

Finally, we are not persuaded that the equities ultimately lie in favor of a retroactive award. Presumably, the State has a definable allocation of monies to be used in

the payment of public aid benefits. An award of retroactive benefits that results in liability of the State for administrative expenses will reduce the availability of funds for the continuing obligations of public assistance programs. *See Edelman,* 415 U.S. at 666 n. 11, 94 S.Ct. at 1357 n. 11. As the Court of Appeals for the Second Circuit noted in a similar context,

> Federal standards are designed to ensure that [the ascertained needs of impoverished persons] are equitably met; and there may perhaps be cases in which the *prompt* payment of funds wrongfully withheld will serve that end. As time goes by, however, retroactive payments become compensatory rather than remedial; the coincidence between previously ascertained and existing needs becomes less clear.

*Rothstein,* 467 F.2d at 235 (emphasis in original), *quoted in Edelman,* 415 U.S. at 666 n. 11, 94 S.Ct. at 1357 n. 11. The purpose of the food stamp program is to enable families to obtain a nutritionally adequate diet. As a practical matter, that goal may not be fulfilled retroactively. Therefore, an award of relief for past errors would be compensatory rather than remedial in nature. Policy considerations strongly suggest that the distribution of limited resources to those presently in need of food stamp assistance better serves the purposes of the Act than an award to persons whose circumstances may have been improved in this interim period.

As an alternative to an award of retroactive benefits, plaintiff requests the form of relief approved in *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). *Quern* held that the Eleventh Amendment does not bar a federal court order that State officials send to the plaintiff class a notice advising the class of the availability of State administrative procedures whereby entitlement to past benefits might be resolved. In the opinion of the court, however, *Quern* is distinguishable from the case at bar.

First and foremost, we incline toward defendant's view that the exception to the Eleventh Amendment created by *Quern* is a narrow one. The *Quern* plaintiffs were accorded prospective relief, and the retroactive remedy, comprised of the notice, was incidental to that prospective remedy. *Quern* cannot be construed to establish an independent basis for retroactive relief where prospective relief is not also forthcoming, at least in the absence of more express direction from the Court. *See McAuliffe v. Carlson,* 520 F.2d 1305, 1308 (2d Cir.1975), *cert. denied,* 427 U.S. 911, 96 S.Ct. 3199, 49 L.Ed.2d 1203 (1976) ("The only exception in this area allows federal courts to require expenditure of state funds in implementing *prospective* relief, since such relief is said to have only an 'ancillary' impact on the state treasury." (Emphasis added)); *see also First Federal Savings & Loan Association v. Casari,* 667 F.2d 734, 741 n. 17 (8th Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 3484, 73 L.Ed.2d 1367 (1982) (Eleventh Amendment does not bar the imposition of a notice requirement which is merely ancillary to prospective or delaratory relief already ordered by the court, and which does not require a retroactive payment of funds from the State treasury).

Second, in the course of the *Quern* opinion, the Court several times observed that defendant made no issue of the administrative expense associated with the preparation and mailing of the notice. *See* 440 U.S. at 335 n. 3, 347 & n. 19, 349, 99 S.Ct. at 1142 n. 3, 1148 & n. 19, 1149. In the instant case, defendant protested the proposed notice initially and renewed his objections at every reasonable opportunity. At the September 2 hearing, plaintiff effectively conceded that the issuance of the notices would be burdensome to defendant, due to the estimated size of the class, the fact that class members and present recipients of benefits are not necessarily one and the same group, and the probability that several forms of notice would likely have to be used.

Finally, to grant plaintiff's request for a *Quern* notice would facilitate indirectly what this court cannot do directly under the proscriptions of the Eleventh Amendment. The notice would allow the plaintiff class members, by virtue of federal sanction, to pursue their claims on the State administrative and judicial levels. Under *Quern,* such a course may be appropriate where prospective relief is also accorded. In the absence of the saving element of prospective relief, a federal court order requiring the State to provide notice of the potential availability of a retroactive remedy, and mandating that the State absorb a portion of the costs thereof, undermines the purpose of the Eleventh Amendment.

We therefore deny plaintiff's motion for summary judgment and direct the Clerk to enter judgment in favor of the defendant upon his motion. No costs.

### On Renewed Motion for Summary Judgment

This matter comes before the court on plaintiff's renewed motion for summary judgment with respect to declaratory relief. We issued an Opinion and Order on September 22, 1982, granting defendant's motion for summary judgment on the grounds that the Eleventh Amendment of the United States Constitution barred this court from granting plaintiff's requested injunctive relief. *Colbeth v. Wilson,* No. 80–317 (D.Vt. Sept. 22, 1982). While our opinion and order mentioned declaratory relief and expressly entered judgment, the analysis we employed to reach our decision was inappli-

cable to the determination of the claims for declaratory relief. *Zwickler v. Koota,* 389 U.S. 241, 254, 88 S.Ct. 391, 398, 19 L.Ed.2d 444 (1967). We therefore granted plaintiff's request that we rule that no final judgment had been issued,[1] and vacated our September 22 opinion and order pending final disposition of the claim for declaratory relief. *Colbeth v. Wilson,* No. 80–317, slip op. at 2 (D.Vt. October 19, 1982). The factual, procedural, and legal background being fully set forth in the September 22 opinion, we proceed directly to consider the issue of declaratory relief.

### Discussion

Although injunctive relief is barred, plaintiff seeks a declaratory judgment which she hopes to employ to advantage in a state court proceeding. Obviously the Eleventh Amendment is inapplicable to the orders of a state court, and, presented with a declaration of the respective rights of the parties, the state court may order whatever injunctive relief is appropriate. By obtaining declaratory relief in this court, plaintiff seeks to eliminate the time-consuming and expensive necessity of rearguing the merits of the controversy, because a declaratory judgment would probably be *res judicata* in state court.[2] There is no authority directly addressing the situation before us, but we believe that such a result effects an impermissible "end run" around the Eleventh Amendment bar and we therefore deny the request for declaratory relief.

---

1. Fed.R.Civ.P. 54(b) provides that
   the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such a determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all of the claims or the rights and liabilities of fewer than all the parties shall not terminate the action . . . .
   As we noted in our October 19 order, the September 22 opinion and order did not comply with the requirements of rule 54(b) and, therefore, was not a final judgment.

2. We do not determine whether the declaratory relief here sought would indeed be *res judicata* in the state action, and we need not do so:
   Is the declaration contemplated here to be *res judicata,* so that the [state court] cannot hear evidence and decide any matter for itself? If so, the federal court has virtually lifted the case out of the State [court] before it could be heard. If not, the federal judgment serves no useful purpose as a final determination of rights.
   *Samuels v. Mackell,* 401 U.S. 66, 72, 91 S.Ct. 764, 767, 27 L.Ed.2d 688 (1971) (quoting *Public Service Commission v. Wycoff Co.,* 344 U.S. 237, 247, 73 S.Ct. 236, 242, 97 L.Ed. 291 (1952)).

We find support for our decision by analogy to actions to enjoin collection of a state tax.[3] Federal district courts are without jurisdiction to entertain such suits except where there is no speedy, adequate state remedy. 28 U.S.C. § 1341 (1976). The United States Supreme Court has held that it is within the sound discretion of a federal court to refuse to grant declaratory relief where injunctive relief would be barred by section 1341 and there is an adequate state remedy. *Great Lakes Dredge & Dock Co. v. Huffman,* 319 U.S. 293, 300–01, 63 S.Ct. 1070, 1074, 87 L.Ed. 1407 (1943). In recent decisions, lower courts have construed section 1341 to bar declaratory judgment actions altogether. *Illinois Central Railroad Co. v. Howlett,* 525 F.2d 178, 181–82 (7th Cir.1975), *cert. denied,* 424 U.S. 976, 96 S.Ct. 1482, 47 L.Ed.2d 746 (1976); *Aluminum Company of America v. Department of the Treasury of Michigan,* 522 F.2d 1120, 1122–23 (6th Cir.1975). The Eleventh Amendment bar against injunctive relief in the present case is even more imposing that the statutory bar of section 1341. Plaintiff cannot be permitted to circumvent it by obtaining relief which would be equally coercive in effect, if not in form.[4]

### Conclusion

For the reasons set forth above, plaintiff's request for summary judgment on the claim for declaratory relief is denied. The opinion and order in this action dated September 22 is reinstated and summary judgment is granted for defendant on all claims. SO ORDERED.

**3.** The principle that declaratory relief should be denied where it would have the same effect as inappropriate injunctive relief was also followed in *Cabrera v. Board of Elections,* 350 F.Supp. 25, 29 (D.N.Y.1972) (citing *Samuels v. Mackell,* 401 U.S. 66, 71–72, 91 S.Ct. 764, 767–768, 27 L.Ed.2d 688 (1971) where plaintiff was denied injunctive relief because of her failure to prosecute her claim vigorously.

**4.** Plaintiff cites an earlier decision by this court in support of her argument that declaratory relief should be awarded. *Duval v. Philbrook,* No. 76–34 (D.Vt. June 3, 1976). The situation in *Duval,* however, differs from the instant case. Plaintiffs in *Duval* were denied injunc-

tive relief not because of the Eleventh Amendment bar, but because they "failed to prove the factual prerequisites to class representation, and their motion for class certification [was] denied." *Id.,* slip op. at 14. Indeed, we acknowledged that the injunctive relief sought in *Duval* "might be considered merely 'ancillary' or 'prospective' under [*Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) ] . . . and might therefore be proper [in such a case]." *Id.* at 13–14. Under those circumstances, the declaratory judgment award did not circumvent the proscription of the Eleventh Amendment.