Marie **DUBUQUE, Lisa LePage, and Beverly Johnson**

v.

Clayton **YEUTTER, Secretary of the United States Department of Agriculture; and Veronica Celani, Commissioner of the Department of Social Welfare, Vermont.**

Civ. No. 88–143.

United States District Court,
D. Vermont.

Sept. 12, 1989.

Opinion On Motion for
Reconsideration Dec. 4, 1989.

---

Sheila E. Reed, John J. McCullough III, Thomas F. Garrett, Vermont Legal Aid, Inc., St. Johnsbury, Vt., for plaintiffs.

Donelle Staley, Asst. Atty. Gen., Waterbury, Vt., Helen Toor, Asst. U.S. Atty., Rutland/Burlington, Vt., for defendants.

OPINION

HOLDEN, Senior District Judge.

The plaintiffs have joined in the complaint that a regulation promulgated by the

Secretary of Agriculture and applied by the Commissioner of Social Welfare misconstrued the Food Stamp Act. They allege the administration of the program has deprived them of food stamps to which the Act entitled them.

Congress amended the Food Stamp Act to disqualify a household from receiving food stamps for ninety days if the head of the household voluntarily quit a job without good cause. 7 U.S.C. § 2015(d)(1)(B)(ii) (1988). The Secretary of Agriculture has defined "head of the household" to be the "principal wage earner" of the household. 7 C.F.R. §§ 273.1(d)(2), 273.7(n) (1988). The defendant Commissioner of Social Welfare, who administers the food stamp program in Vermont in accordance with federal standards, has adopted and applied the Secretary's definition to all households in Vermont. *Vermont Welfare Assistance Manual* §§ 273.1(d)(2), 273.7(n); *see also* 7 C.F.R. § 272.1(g)(82) (1988). The plaintiffs contend that "head of the household" does not mean "principal wage earner," and that their households were entitled to the food stamps withheld from them when the primary wage earner, other than the head of the household, voluntarily quit his employment.

The parties have now filed cross-motions for summary judgment.[1] The plaintiffs seek class certification, restoration of the benefits that were withheld, declaratory and injunctive relief against application of the regulation, and an award of reasonable attorney's fees.[2] Oral argument was heard on July 14, 1989. The facts are stipulated.[3] The court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337. Memorandum and Interlocutory Order at 3–4 (filed Feb. 21, 1989).

## THE FACTS

### Marie Dubuque

The claim of the first named complainant, Marie Dubuque, was dismissed from the action on motion of counsel after she was granted relief through an administrative hearing.[4]

### Lisa LePage

The plaintiff Lisa LePage, 26 years old, is the head of a household comprising her three minor children, herself and from December 1986 through March 1988, a boyfriend. Her friend was not the father of her children, nor did he have any legal obligation to support the plaintiff or her children. While he was a member of the household, he began working, but quit after three weeks. The Department of Social Welfare determined that he had been the primary wage earner for the preceding three weeks, that he had voluntarily quit without good cause, and that food stamps which the household had been receiving would be withheld from the entire household for ninety days. The suspension commenced September 1, 1987.

### Beverly Johnson

The plaintiff Beverly Johnson, 40 years old, is the head of a household that comprised her son, 19 years old, and her three minor children. In early 1986, she and her son were both employed, but his monthly income was greater than hers. The household was not receiving food stamps because the collective income exceeded the requirements of the program; however, the plaintiff was receiving Aid to Needy Families with Children. The plaintiff applied for food stamps after her son quit his job. The Department of Social Welfare concluded that her son was the primary wage earner of the household, that he had voluntarily quit his job without good cause within sixty days prior to the application, and that the household therefore would not be entitled to food stamps for ninety days. The sanction commenced June 9, 1986.

## THE DISCUSSION

### Standing

Before reaching the questions of law which the parties seek to resolve by way of

---

1. United States' Motion for Summary Judgment (filed July 12, 1989); Defendants' Motion [by Defendant Celani] for Summary Judgment (filed July 12, 1989); Plaintiffs' Motion for Summary Judgment (filed June 12, 1989).

2. Complaint at page 11 (filed June 22, 1988).

3. Stipulation of Facts (filed May 15, 1989).

4. Motion to Dismiss (filed April 18, 1989).

summary adjudication, the court is confronted with the standing of the complainants to obtain the compensatory and injunctive relief requested for the class they purport to represent.

■ The plaintiffs seek compensatory, declaratory and injunctive relief. A fundamental prerequisite for such remedies is standing. *E.g., O'Shea v. Littleton,* 414 U.S. 488, 493–95, 94 S.Ct. 669, 674–76, 38 L.Ed.2d 674 (1974); *see* U.S. Const. art. III, § 2. "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). If the injurious conduct no longer persists when the complaint is filed, a plaintiff might have residual standing to seek damages. *E.g., City of Los Angeles v. Lyons,* 461 U.S. 95, 105 & n. 6, 106 n. 7, 103 S.Ct. 1660, 1667 & n. 6, 1668 n. 7, 75 L.Ed.2d 675 (1983). Standing to obtain injunctive relief requires the real and immediate threat of further injury to the complainant. *Id.* at 101–10, 103 S.Ct. at 1664–70. The Supreme Court noted that " '[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.' " *Id.* at 102, 103 S.Ct. at 1665 (quoting *O'Shea v. Littleton,* 414 U.S. at 495–96, 94 S.Ct. at 675–76).

■ According to the stipulated facts, the plaintiff LePage's benefits were withheld for ninety days commencing September 1, 1987, by application of the challenged regulation. Under the same regulation, the defendant Celani denied the plaintiff Johnson's application for food stamps for ninety days commencing June 9, 1986. These plaintiffs have standing to seek compensatory relief. *See O'Shea v. Littleton,* 414 U.S. at 493–95, 94 S.Ct. at 674–76. Any other harm, of which the plaintiffs complain, ended well before they filed their complaint on June 22, 1988. They have not alleged in any of their submissions that they expect the return of a like injury in the future. Standing to seek injunctive relief would require a real and immediate threat that the principal wage earner of the household, rather than any other member, will quit employment; that the quit will be voluntary; that it will be without good cause, rather than reasonable; and that the principal wage earner will not be the same person as the head of the household. The court cannot anticipate that such an uncertain variety of circumstances will visit either plaintiff in the immediate future. The plaintiffs make no allegation to this effect. Therefore, they lack standing to seek injunctive relief. *See, e.g., City of Los Angeles v. Lyons,* 461 U.S. at 101–10, 103 S.Ct. at 1664–70.

The petition for declaratory relief stands differently and on firmer footing. *See Steffel v. Thompson,* 415 U.S. 452, 466, 94 S.Ct. 1209, 1219, 39 L.Ed.2d 505 (1974).

## Class Certification

Related to standing is the question of whether the suit is maintainable as a class action under Rule 23(b)(2), Fed.R.Civ.P. The motion asserted in the complaint for class certification was denied by memorandum opinion and order earlier in these proceedings for lack of the essential prerequisite imposed by Rule 23. *Duquette v. Lyng, Sec.,* 88–142 D.Vt. (Feb. 21, 1989). The plaintiffs have again pressed for the same result by a supplemental motion to certify a class of plaintiffs defined as follows:

> All food stamp applicants and recipients residing in Vermont, who belong to households in which the household's primary wage earner is not the head of the household and has quit or will quit his or her job, and who are subject to sanctions under Vermont Welfare Assistance Manual (WAM) § 273.1. Supplemental Motion for Class Certification (filed June 22, 1988).

During the pendency of the supplemental request the court received, and included in the record, a communication from counsel for the plaintiffs informing that the plaintiff Johnson is no longer a member of the class for whom prospective relief is available and hence can no longer serve as a

representative plaintiff.[5]

The subsequent submissions furnished by the plaintiffs have failed to cure the shortages in the requirements for class certification under Fed.R.Civ.P. 23(b)(2). The plaintiffs' second request for class certification is denied.

*Sovereign Immunity*

 The Eleventh Amendment of the United States Constitution bars extension of the federal judicial power "to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State". U.S. Const. amend. XI. It also provides the defense of sovereign immunity in suits in federal court against a state by a citizen of the same state. *E.g., Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 98–100, 104 S.Ct. 900, 906–908, 79 L.Ed.2d 67 (1984); *Hans v. Louisiana,* 134 U.S. 1, 10, 10 S.Ct. 504, 505, 33 L.Ed. 842 (1890). This defense extends to an action to enjoin a state official to pay retroactive benefits wrongfully withheld by the state in a federal-state program funded by the state and federal governments and administered by the state. *Edelman v. Jordan,* 415 U.S. 651, 663–72, 94 S.Ct. 1347, 1355–60, 39 L.Ed.2d 662 (1974). If not waived, the immunity also applies to a claim against the Commissioner of Social Welfare for retroactive benefits under the Food Stamp Act. Although the federal government pays 100 percent of the benefits, the state pays 50 percent of the administrative expenses, and state provision of retroactive benefits entails administrative expenses to be paid

from the state treasury. *Colbeth v. Wilson,* 554 F.Supp. 539 (D.Vt.1982), *aff'd sub nom. Colbeth v. O'Rourke,* 707 F.2d 57 (2d Cir.1983); *accord Cotton v. Mansour,* 863 F.2d 1241, 1245–47 (6th Cir.1988).

The Commissioner has asserted the defense of sovereign immunity.[6] *See Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 242–46, 105 S.Ct. 3142, 3147–49, 87 L.Ed.2d 171 (1985); *Edelman v. Jordan,* 415 U.S. at 671–74, 94 S.Ct. at 1359–61. The grant of retroactive food stamp benefits to the plaintiffs is precluded against the state defendant, because such an award involves expenditures from the state's general fund. *Colbeth v. O'Rourke,* 707 F.2d 57. Consequently, the plaintiffs can only seek retroactive benefits from the federal defendant in his capacity as Secretary of Agriculture.

*Cross–Motions for Summary Judgment*

The complaint asserts three grounds against the federal defendant and two against the state commissioner: (1) The Secretary's regulation equating "head of the household" with "principal wage earner" deprives the plaintiffs of rights secured by the Food Stamp Act, 7 U.S.C. §§ 2011–2024. (2) It violates the Administrative Procedures Act, 5 U.S.C. § 706, because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; and (3) it deprives them of due process under the Fifth Amendment of the Constitution.

The remaining claims state that (4) the defendant Celani's application of the regu-

---

**5.** We have learned that earlier this month Beverly Johnson began working at a full-time job. When the penalty was originally assessed against her household Ms. Johnson's son was considered the head of the household because he was the primary wage earner. Now that Ms. Johnson is working full-time, however, the regulations provide that her son cannot be considered the head of household. 7 C.F.R. § 273.1(d)(2). Therefore, although Ms. Johnson has already suffered an improper denial of benefits, because of this regulation she is not subject to the regulation at present, and she is no longer a member of the class for whom prospective relief is available. Thus, it is clear that she can no longer serve as a representative plaintiff.

Because our discovery has established that there is a large number of households, and because this is a situation that is capable of repetition, yet evading review, we request that the court reserve decision on the pending motions for thirty days to allow us to move to substitute other named plaintiffs. In the alternative we would ask to be permitted to amend the definition of the class in a way that preserves the class claims for retrospective relief.
Letter, dated July 24, 1989, from plaintiff's counsel to the court.

**6.** Defendants' Memorandum [by Defendant Celani] in Support of Motion for Summary Judgment at 7–9 (filed July 12, 1989); Answer of Defendant Celani at 5 (filed July 15, 1988).

lation contravenes the provisions of 42 U.S.C. § 1983; and (5) deprives the plaintiffs of Due Process under the Fourteenth Amendment.[7] The motions for summary judgment are directed to the first claim, that is the "head of the household" issue. No further argument is made concerning the application of the Administrative Procedures Act, section 1983, nor the Due Process clauses of the Fifth and Fourteenth Amendments to the Constitution.[8]

■ The Food Stamp Act implicitly permits a private right of action. *Haskins v. Stanton*, 794 F.2d 1273, 1274–75 (7th Cir. 1986); *cf. Victorian v. Miller*, 813 F.2d 718, 720–21, 724 n. 13 (5th Cir.1987) (holding that the Act creates enforceable rights, but not deciding whether the statute directly implies a private right of action).

> The key to the inquiry [whether a federal statute creates a private right of action] is the intent of the Legislature.... We look first ... to the statutory language, particularly to the provisions made therein for enforcement and relief. Then we review the legislative history and other traditional aids of statutory interpretation to determine congressional intent.

*Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 13, 101 S.Ct. 2615, 2622, 69 L.Ed.2d 435 (1981) (Powell, J.) (citations omitted). The statute contemplates "judicial action arising under this chapter" for wrongful withholding of allotments of food stamps. 7 U.S.C. § 2023(b) (1988); *see* H.R.Rep. No. 464, 95th Cong., 1st Sess. 398 (1977), *reprinted in* 1977 U.S.Code Cong. & Admin. News 1704, 1978, 2327.

■ Rule 56 of the *Federal Rules of Civil Procedure* provides:

> [Summary] judgment ... shall be rendered ... if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the [supporting] affidavits [in the moving party's favor], if any, show that there is no genu-

ine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The substantive law determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of statutory construction and legislative history are questions of law. *Oklahoma ex rel. Dep't of Human Servs. v. Weinberger*, 741 F.2d 290, 291 (10th Cir.1983); *Helm v. California*, 722 F.2d 507, 509 (9th Cir.1983).

Nearly identical versions of these two regulations were applied to the plaintiffs Johnson and LePage in 1986 and 1987 respectively. *See* 7 C.F.R. §§ 273.1(d)(2), 273.7(n) (1987); *id.* 273.7(n) (1986).

■ The Supreme Court has delineated the appropriate method for considering the questions presented.

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 n. 9, 104 S.Ct. 2778, 2781–82 n. 9, 81 L.Ed.2d 694 (1984) (footnotes omit-

---

7. Complaint at 9–10.

8. Memorandum of the United States in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of the United States' Cross-motion for Summary Judgment at 10–24 (filed July 12, 1989); Defendants' Memorandum [by Defendant Celani] in Support of Motion for Summary Judgment at 4–7; Plaintiffs' Memorandum in Support of Motion for Summary Judgment at 3–4, 5–15.

ted), *quoted in Young v. Community Nutrition Inst.*, 476 U.S. 974, 980, 106 S.Ct. 2360, 2364, 90 L.Ed.2d 959 (1986). Only an administrative construction that is contrary to congressional purpose is to be rejected by the judiciary. 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11. And "regulations are given controlling weight unless that are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. at 2782.

### The Statutory Scheme

The starting point is the delared policy of the enactment. The Act states its purpose "to be the policy of Congress, in order to promote general welfare, to safeguard the health and well being of the Nation's population by raising levels of nutrition among the low-income households." The purpose derives from the lawmakers' finding that limited food purchasing power contributes to hunger and malnutrition among the members of such households. Congress further concluded that increased utilization of the Nation's abundant food supplies will promote its distribution to strengthen the agricultural economy and aid the marketing and distribution of food to households in need. 7 U.S.C. § 2011.

The Food Stamp Act, as amended, provides in pertinent part:

Unless otherwise exempted by the provisions of paragraph (d)(2) of this subsection, ... (B) no household shall be eligible to participate in the food stamp program ... (ii) if the head of the household voluntarily quits any job without good cause, but, in such case, the period of ineligibility shall be ninety days.

7 U.S.C. § 2015(d)(1)(B)(ii) (1988).

The statute also delegates to the defendant Secretary the authority to promulgate regulations:

The Secretary shall issue such regulations consistent with this chapter [51 of title 7] as the Secretary deems necessary or appropriate for the effective and efficient administration of the food stamp program and shall promulgate all such regulations in accordance with the procedures set forth in section 553 of title 5.

*Id.* § 2013(c). Pursuant to this authority, the Secretary promulgated the challenged regulations:

(d) *Head of household.* (1) State agencies may designate the head of household or permit the household to do so....

(2) For purposes of failure to comply with §§ 273.7 ... head of household shall be considered to be the principal wage earner. The principal wage earner shall be the household member (including excluded members) who is the greatest source of earned income in the two months prior to the month of the violation. This provision applies only if the employment involves 20 hours or more per week or provides weekly earnings at least equivalent to the Federal minimum wage multiplied by 20 hours....

7 C.F.R. § 273.1(d) (1988) (italics in original). The operational regulation of section 273.7 prescribes:

No household whose head of household [i.e. "principal wage earner"] voluntarily quit his or her most recent job without good cause shall be eligible for participation in the Program....

*Id.* § 273.7(n).

Congress did not define "head of household" in the original enactment of 1977, or in any subsequent amendment to 7 U.S.C. § 2015(d)(1). The absence of definition, however, does not signify that Congress had no intention or that Congress's intent was ambiguous, because the term might have a plain meaning. Courts are "generally require[d] ... to assume that 'the legislative purpose is expressed by the ordinary meaning of the words used.'" *United States v. Locke*, 471 U.S. 84, 95, 105 S.Ct. 1785, 1792, 85 L.Ed.2d 64 (1985) (quoting *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962)). If the language of the statute is clear, courts "look to the legislative history to determine only whether there is 'clearly expressed legislative intention' contrary to that language". *Immigration & Naturalization Serv. v. Cardoza–Fonseca*, 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434 (1987); *accord Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184

n. 29, 98 S.Ct. 2279, 2296 n. 29, 57 L.Ed.2d 117 (1978).

The statutory definition of "household," set forth in the margin, evinces a meaning peculiar to the Food Stamp Act, before and after amendment in 1977.[9] Basically, a "household" comprises an individual, as well as groups related and unrelated individuals, who customarily purchase food and prepare meals together for consumption at home. *See* 7 U.S.C. § 2012(i) (1988).[10] The Supreme Court has considered this unusual nature in *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973). Because "household" did not and does not convey a plain or commonplace meaning, "head of the household" in the context of the Food Stamp Act may depart from the general accepted and traditional meaning.[11]

In cases where the statute's meaning is not obvious, the court is referred to the legislative history to determine whether Congress expressed an intention about the issue in question. *Blum v. Stetson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984); *Allen v. State Bd. of Elections*, 393 U.S. 544, 570, 89 S.Ct. 817, 834, 22 L.Ed.2d 1 (1969); *see Southeastern Community College v. Davis*, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979). In reviewing Congressional history, isolated statements made by lawmakers after the enactment cannot substitute for expressions of legislative purpose at the time the provision was enacted. *Id.* at 411 n. 11, 99 S.Ct. at 2370 n. 11;

9. In 1976, the statute defined "household" as—

a group of related individuals (including legally adopted children and legally assigned foster children) or non-related individuals over age 60 who are not residents of an institution or boarding house, but are living as one economic unit sharing common cooking facilities and for whom food is customarily purchased in common. The term "household" shall also mean (1) a single individual living alone who has cooking facilities and who purchases and prepares food for home consumption, (2) an elderly person who meets the requirements of section 2019(h) of this title, or (3) any narcotics addict or alcoholic who lives under the supervision of a private nonprofit organization or institution for the purpose of regular participation in a drug or alcoholic treatment and rehabilitation program. No individual who receives supplemental security income benefits under title XVI of the Social Security Act [42 U.S.C. 1381 et seq.] shall be considered to be a member of a household or an elderly person for any purpose of this chapter for any month if such person receives for such month, as part of his supplemental security income benefits or payments described in section 1616(a) of the Social Security Act [42 U.S.C. 1382e(a) ] (if any), an amount equal to the bonus value of food stamps.... Residents of federally subsidized housing for the elderly ... shall not be considered residents of an institution or boarding house for purposes of eligibility for food stamps under this chapter.

7 U.S.C. § 2012(e) (1976). In 1977, the definition of "household" was amended to mean

(1) an individual who lives alone or who, while living with others, customarily purchases food and prepares meals for home consumption separate and apart from the others, or else pays compensation to the others for such meals, or (2) a group of individuals who live together and customarily purchase food and prepare meals together for home consumption or else live with others and pay compensation to the others for such meals. In neither event shall any individual or group of individuals constitute a household if they reside in an institution or boarding house. For the purposes of this subsection, residents of federally subsidized housing for the elderly and narcotics addicts or alcoholics who live under the supervision of a private nonprofit institution for the purpose of regular participation in a drug or alcoholic treatment program shall not be considered residents of institutions.

7 U.S.C. § 2012(i) (Supp. I 1977).

10. Under the current definition, "household" means

(1) an individual who lives alone or who, while living with others, customarily purchases food and prepares meals for home consumption separate and apart from the others, (2) a group of individuals who live together and customarily purchase food and prepare meals together for home consumption, or (3) a parent of minor children and that parent's children (notwithstanding the presence in the home of any other persons, including parents and siblings of the parent with minor children) who customarily purchase food and prepare meals for home consumption separate from other persons....

7 U.S.C. § 2012(i) (1988).

11. The usual meaning of "head of the household" is a person who has moral or legal responsibility for a household of individuals and actually supervises and manages the affairs of the household. H. Black, *Black's Law Dictionary* 648 (West Publishing Co. 5th ed. 1979).

*Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 758, 99 S.Ct. 2066, 2072, 60 L.Ed.2d 609 (1979); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 354 n. 39, 97 S.Ct. 1843, 1864 n. 39, 52 L.Ed.2d 396 (1977). *Compare Red Lion Broadcasting Co. v. Federal Communications Comm'n,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969) (subsequent statutory amendment which declares the intent of a prior statute about the precise issue is relevant).

■■■ Congress amended 7 U.S.C. § 2015(d) in 1977 to prescribe that

> no household shall be eligible for assistance under this chapter if it includes a physically fit person between the ages of eighteen and sixty who ... (iii) is head of the household and voluntarily quits any job without good cause, unless the household was certified for benefits under this chapter immediately prior to such unemployment[.]

7 U.S.C. § 2015(d)(1)(iii) (Supp. I 1977). When Congress enacted this provision, "head of household" had a particular meaning. Since 1964, when the Food Stamp Act was first enacted, "head of household" had meant "the member of the household in whose name application is made for participation in the [Food Stamp] Program". 7 C.F.R. § 1600.2(r) (1967); 29 Fed.Reg. 16,-784, 16,785 (1964) (defining "head of the household" at 7 C.F.R. § 1600.2(s)). The House Committee on Agriculture reiterated that definition when it explained the purpose of the amendment:

> There is no prohibition, however, against the head of household (that member in whose name application is made for participation in the program) that was, while the head was working, ineligible for food stamps quitting work and thereby rendering the entire household eligible for food stamps. To avoid this anomaly, the Committee would prevent such a work drop-out and the household of which he or she was from becoming eligible for food stamps unless there was good cause....

H.R.Rep. No. 464, 95th Cong., 1st Sess. 168 (1977), *reprinted in* 1977 U.S.Code Cong. & Admin.News 1978, 2138.

"Head of household" was a fundamental concept in the practical operation of the Food Stamp Program. Its significance was not limited to instances when the head of the household voluntarily quit without good cause. The Committee on Agriculture was contemplating this same definition when it recounted in the legislative history the role of the head of household:

> [t]he household, through its *head* or spouse or his or her authorized representative, must appear at the office in order to obtain and fill out the application form ... and to undergo an interview
>
> . . . .
>
> Where it is impossible for the *head of the household* or the spouse to make application for participation, a responsible household member may be designated as the authorized representative.... [A] responsible adult outside the household may be designated if the *head of the household,* the spouse, or other responsible household members cannot be interviewed; the authorized representative has been designated in writing by the *head of the household* or the spouse;....
>
> An eligible household receives its ATP [authorization-to-purchase] card....
>
> The data processing unit prepares an identification card which is issued to the *head* of each eligible household as proof of eligibility when purchasing or using food coupons.
>
> The case number, project area code, and eligibility for delivered meals are required information on the card, as well as the name of *household head* or spouse, the name of designated authorized representative and signature lines for *household head* or spouse or authorized representative....
>
> The recipient takes his ATP card and ID card to the issuance unit, ... which is responsible for the issuance of coupons to and the collection of cash from eligible households.

In the issuance unit, the *household head* or spouse, or authorized representative, ... presents the household's ID card, ATP card, and purchase requirement.... Food stamps may be used by the *head of the eligible household* or other persons selected by him [the *head of the household* ], but, upon request, the person using the stamps is required to present the identification card issued to the *head of the household* to the redeeming food store or meal service.

....

The Committee also chose not to mandate that each food stamp be countersigned when purchased and used. Requiring countersignatures would result in longer lines at food stamp issuance outlets and grocery stores. No other household member could use the stamps, regardless of the *head*'s work or health status, nor would an authorized representative be able to help....

H.R.Rep. No. 464, 95th Cong., 1st Sess. 254, 264–65, 306, 308, 309, 325–26, 335 (1977) (underlining added), *reprinted in* 1977 U.S.Code Cong. & Admin.News 1978, 2199, 2200, 2242, 2244, 2245, 2261, 2270. Both this usage and the parenthetical definition in the legislative history repeated the Secretary's definition of "head of household" since 1964. Where "Congress ... employed terminology that evokes a tradition of meaning, ... [i]t may be assumed, in the absence of indications to the contrary, that Congress intended this language to be read in light of that tradition." *St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 541, 98 S.Ct. 2923, 2929, 57 L.Ed.2d 932 (1978). The legislative history makes clear the meaning Congress intended for "head of the household" in 7 U.S.C. § 2015(d)(1)(iii): "that member in whose name application is made for participation in the program." This person is not necessarily the actual applicant, for the head of the household may designate an authorized representative to apply. H.R.Rep. No. 464, 95th Cong., 1st Sess. 254, 264–65, *reprinted in* 1977 U.S.Code Cong. & Admin.News

1978, 2199, 2200; *see* H.R.Conf.Rep. 599, 95th Cong., 1st Sess. 196 (1977) (Conference deleted an amendment requiring a duplicate of actual applicant's application to be furnished to the head of the household), *reprinted in* 1977 U.S.Code Cong. & Admin.News 2445, 2496. Whether the application was presented by the householder or his delegate, the head of the household was taken to be the member responsible for the household's participation in the Food Stamp Program.[12]

In both statute and the regulations, "head of household" had conveyed this meaning from 1964 until after Congress amended section 2015 in 1977. In 1979, the Secretary, by regulation, substituted "primary wage earner" for "head of household", providing that "[n]o applicant household whose primary wage earner voluntarily quit his/her most recent job without good cause shall be eligible for participation in the Program...." 7 C.F.R. § 273.7(c) (1980); 44 Fed.Reg. 17,982, 17,-984 (1979).

The Secretary acknowledged this departure from the norm:

The title "head of household" is currently assigned to the person in whose name application is made for the program. The Department proposes that the State agency shall classify as head of household that household member who " * * * was responsible for acquiring the greatest amount of financial support within the last 60 days." The change is proposed in response to the statutory requirement that a household not already certified be ineligible for 60 days after the "head of household" voluntarily quits a job without good cause. This statutory disqualification places new importance on the definition of household head. The Congressional purpose is to prevent the family bread winner from voluntarily quitting work and then immediately relying on the program for support. The

---

**12.** In 1977, and before, the word "householder" was defined to be "the master or head of a family: one who occupies a home or separate

tenement with his family or alone." *Webster's Third New International Dictionary* 1046 (1971).

Department's proposed head of household definition enforces that purpose.

43 Fed.Reg. 18,874, 18,879 (1978).

Nearly all of the 300 commenters discussing this section criticized this definition [as primary wage earner] because it would permit a minor to be the household head and would cause the household head to change frequently. Since this regulatory definition was proposed only for purposes of implementing the voluntary quit provision of the Act, it has been modified. States may devise their own method for designating the head of household. However, that definition may be used purely for recordkeeping purposes and cannot be used to impose restrictions on who may apply for food stamps. A definition of primary wage earner will be proposed in subsequent rulemaking in order to implement the voluntary quit provision.

43 Fed.Reg. 47,846, 47,853 (1978).

In summary, the Secretary redefined "head of household" only for purposes of the one provision, not for purposes of the entire Act. The Secretary agreed that the specialized definition, when applied throughout the Act, was unworkable; it was inconsistent with the statutory scheme and the role of the head of the household throughout the Food Stamp Program.

In consequence of the Secretary's substitution as applied here, an unrelated male friend of the plaintiff LePage, living with her and her three minor children, was deemed the "head of the household". Similarly, the son of the plaintiff Johnson, who was nineteen years old, by operation of the regulation, became the "head of the household".[13] For all other purposes, the plaintiffs LePage and Johnson themselves were in the status of the "head of the household".[14] If "head of the household" should have the same meaning throughout, as the legislative history of 1977 indicated, then the Secretary's regulation is contrary to the statute. *See, e.g., Russo v. Texaco, Inc.,* 808 F.2d 221, 227 (2d Cir.1986) (same term used more than once in a section of a statute will be construed to have the same meaning throughout the section); *United States v. Ivic,* 700 F.2d 51, 60 (2d Cir.1983) (Friendly, J.) (same); *Firestone v. Howerton,* 671 F.2d 317, 320 n. 6 (9th Cir.1982) (in general, same term used in different sections of a statute will be given the same meaning).

The Secretary based the deviation upon the purpose of the amendment in 1977. 43 Fed.Reg. 18,874, 18,879 (1978).[15] The Secretary has characterized the Congressional purpose differently from the expression of the Congress itself as shown in the legislative history. *Compare* H.R.Rep. No. 464, 95th Cong., 1st Sess. 168 (1977) (disqualification when "head of the household" voluntarily quits without good cause), *with* 43 Fed.Reg. 18,874, 18,879 (1978) (disqualification when "family bread winner" voluntarily quits without good cause). The Secretary's regulation focusses upon economic criteria and disqualifies a greater number of households than does the statutory provision—not only those households where the "head of the household" is the primary wage earner, but also those households, such as the households involved in this case, where the "head of the household" is not the primary wage earner. It imposes the sanction of disentitlement to food stamps for conduct on the part of that member of the household who earns or makes the most money, whether or not that person is chiefly responsible for the group that makes up the household as the beneficiaries of the food stamps. Congress did not disqualify the household whenever any member of the household voluntarily quit without good cause, but only when the head of the household did so. The regulation must be consistent not only with the

---

**13.** Stipulation of Facts ¶¶ 7–11, 12–16.

**14.** Complaint ¶ 28, 34; *see* Memorandum of the United States in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of the United States' Cross-motion for Summary Judgment at 9–10.

**15.** *See also* Memorandum of the United States in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of the United States' Cross-motion for Summary Judgment at 12–19.

purpose of the amendment, but also with the language of the statute:

Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating the intent, the final language of the legislation may reflect hard-fought compromises. Invocation of the "plain purpose" of the legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.

*Board of Governors v. Dimension Fin. Corp.,* 474 U.S. 361, 373–74, 106 S.Ct. 681, 688–89, 88 L.Ed.2d 691 (1986).

Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.

*Rodriguez v. United States,* 480 U.S. 522, 526, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987) (emphasis in original).

In 1981, Congress amended the law to apply the provision as well to heads of households already receiving benefits, who voluntarily quit without good cause. *See* 7 U.S.C. § 2015(d)(1)(iii) (Supp. V 1981). To be sure, the conference report described the amendment in terms of "primary wage earner", not "head of household" nor "member in whose name application is made for participation":

The *House* amendment extends the scope of the existing law disqualifying *applicant* households for 60 days, if the primary wage earner has voluntarily quit a job without good cause, to include *recipient* households.

H.R.Conf.Rep. No. 377, 97th Cong., 1st Sess. 218 (1981) (emphasis in original), *reprinted in* 1981 U.S.Code Cong. & Admin. News 1965, 2250, 2315. The report does not purport to express a purpose to redesign the operation and effect of the Act.

In 1982, Congress extended to ninety days the period for which households were ineligible either to apply for or to continue receiving benefits. 7 U.S.C. § 2015(d)(1)(iii) (1982). In 1985, Congress enacted the current version, quoted above, which merely reorganized and renumbered the substantive provision already in effect. *See* 7 U.S.C. § 2015(d)(1)(B)(ii) (Supp. III 1985). In 1986 the Secretary amended the definition of "head of the household" to mean "principal wage earner" for purposes of the statutory disqualification at issue. 7 C.F.R. § 273.1(d)(2) (1987).

The conference report in 1981 may suggest a correlation to equate "head of household" with "primary wage earner." The defendants urge that this reference indicates Congressional intent to adopt the Secretary's new definition which simply meant "the person who makes the largest financial contribution to the household."[16] To the contrary, the new definition speaks only in terms of one who earns the most money, rather than a breadwinner whose wages solely or largely defray the household living expenses. *See Webster's Third New International Dictionary,* 271 (1971). Reference to this portion of the legislative history in 1981 cannot substitute for the intent of the enacting Congress in 1977. *E.g., Southeastern Community College v. Davis,* 442 U.S. 397, 411 n. 11, 99 S.Ct. 2361, 2370 n. 11, 60 L.Ed.2d 980 (1979).

The amendment of 1981 was not directed to the definition of "head of the household," but applied the original provision to heads of households already identified by the Food Stamp Program that were then receiving food stamps. *Compare Red Lion Broadcasting Co. v. Federal Communications Comm'n,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969). The legislative histories of 1982

---

**16.** Memorandum of the United States in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of the United States' Cross-motion for Summary Judgment at 20–21.

and 1985 described the operation of the respective amendments in terms of "head of the household." H.R.Rep. No. 271, 99th Cong., 1st Sess., pt. 1, at 313 (1985), *reprinted in* 1985 U.S.Code Cong. & Admin. News 1103, 1417; S.Rep. No. 504, 97th Cong., 2d Sess. 38, 90, 120 (1982), *reprinted in* 1982 U.S.Code Cong. & Admin. News 1641, 1677, 1728, 1758. The statute has consistently been applied to the "head of the household." 7 U.S.C. § 2015(d)(1)(B)(ii) (1988); *id.* § 2015(d)(1)(B)(ii) (Supp. III 1985); *id.* § 2015(d)(1)(iii) (1982); *id.* (Supp. V 1981); *id.* (Supp. I 1977).

Congress's intention that "head of the household" mean the member of the household who was designated as being responsible for it in the Food Stamp Program is evident from the legislative history in conjunction with the language of 7 U.S.C. § 2015(d). The Secretary's regulation engrafts a new meaning which is contrary to that intention. For the reasons stated above, the court will grant the plaintiff's motion for summary judgment and deny the cross motion of the defendant Secretary of Agriculture.

*The Appropriate Relief*

 The Food Stamp Act provides that "any food stamp allotments found to have been wrongfully withheld shall be restored only for periods of not more than one year prior to the date of the commencement of such action." 7 U.S.C. § 2023(b) (1988). The complaint in this action was filed on June 22, 1988. The sanction imposed upon the plaintiff LePage commenced on September 1, 1987, within the year preceding the filing of this action. More than one year had elapsed after the sanction imposed upon the plaintiff Johnson from June 9, 1986, until September 7, 1986.[17] Although benefits were withheld from the plaintiff Johnson's household, the award of retroactive benefits is precluded by the time limitation imposed by the statute. 7 U.S.C. § 2023(b) (1988); *Klaips v. Berg-*

*land,* 715 F.2d 477, 484 & n. 15 (10th Cir. 1983); *see Meyer v. Lyng,* 859 F.2d 62, 64 n. 4 (8th Cir.1988).

The plaintiff LePage was already receiving food stamps when the sanction under 7 C.F.R. § 273.7(n) was imposed.[18] The eligibility of her household was previously established. The amount of food stamps to which her household was entitled in the absence of her friend's income is determined according to uniform national standards which the Secretary promulgates. 7 U.S.C. §§ 2014(b), 2017(a) (1988); 7 C.F.R. §§ 273.8–.10 (1988). The Secretary also issues the coupons to the state, which the state then distributes in accordance with the prescribed federal standards. 7 U.S.C. § 2016(a) (1988); 7 C.F.R. §§ 274.1(a), 274.-4(e) (1988). The Secretary therefore can review the file of the plaintiff LePage, ascertain in accordance with these federal standards the amount to which her household was entitled between September 1, 1987, and November 30, 1987, and issue to her household the amount of food stamps wrongfully withheld under sanction of 7 C.F.R. §§ 273.1(d)(2), 273.7(n) (1987), during that period. The court will order the Secretary to furnish food stamps to the plaintiff LePage's household that were withheld during the three month period.

Judgment will be entered on notice and hearing to be scheduled by the clerk.

SO ORDERED.

## ON MOTION FOR RECONSIDERATION

The Secretary of the United States Department of Agriculture has moved for reconsideration of that portion of the court's opinion entered September 12, 1989, which grants the plaintiffs' motion for summary judgment in awarding food stamp benefits against the definition "head of household" as prescribed by the agency in applying the "voluntary quit" provision of the Food Stamp Act. 7 U.S.C. § 2015(d)(1)(B)(ii),[19] 7

---

**17.** Stipulation of Facts ¶¶ 10, 16.

**18.** *Id.* ¶ 8.

**19.** [N]o household shall be eligible to participate in the food stamp program … if the

head of the household voluntarily quits any job without good cause, but, in such case, the period of ineligibility shall be ninety days.... Any period of ineligibility for violations under this paragraph shall end when the household member who committed the violation com-

C.F.R. §§ 273.1(d)(2) and 273.7(n) (1988).[20] The statute provides no definition of the term "head of household."

The Secretary contends that to reject the "principal wage earner" is contrary to the Congressional purpose behind the "voluntary quit" provision. Memorandum of Law in Support of Motion for Reconsideration, p. 2.

As applied to the LePage household, the regulatory definition of "primary wage earner" drains responsibility from the meaning of the words, enlarges the penalty and eliminates the nutritional benefits previously served by the Food Stamp program. This interpretation, as applied here, represents "an attempted addition to the statute of something which is not there. As such the regulation can furnish no sustenance to the statute." *United States v. Calamaro*, 354 U.S. 351, 359, 77 S.Ct. 1138, 1143, 1 L.Ed.2d 1394 (1957) (Harlan, J.); *Manhattan General Equipment Co. v. Commissioner*, 297 U.S. 129, 134, 56 S.Ct. 397, 399, 80 L.Ed. 528 (1936); *Iglesias v. United States*, 848 F.2d 362, 366 (2d Cir.1988).

In deference to the regulations, the Secretary reaffirms reliance on *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *Wilson v. Lyng*, 856 F.2d 630 (4th Cir.1988) and *Verna v. Coler*, 710 F.Supp. 1339 (S.D.Fla.1989).

In *Chevron* the principle of deference to an administrative interpretation was applied in the context of the particular program where the situation depended on special knowledge and expertise. 467 U.S. at 844–45, 104 S.Ct. at 2782–83. The meaning of the words "head of household" requires no special experience or technical learning. Interpretive standards include other factors for measuring the deference due the administrator's regulation. *E.g., Immigration and Naturalization Service v. Cardoza Fonseca*, 480 U.S. 421, 432, 107 S.Ct. 1207, 1214, 94 L.Ed.2d 434 (1987); *Massachusetts Trustees of Eastern Gas & Fuel Association v. United States*, 377 U.S. 235, 241, 84 S.Ct. 1236, 1241, 12 L.Ed.2d 268 (1964). *See also,* K. Davis, Administrative Law, § 5.04, p. 131 (3rd Ed.).

The movant relies on the fact that the 1981 amendment to the Food Stamp Act, which made no changes in the voluntary quit provision, must be regarded as legislative approval of the Secretary's expanded definition of "head of household" to mean the primary or principal wage earner.

> Legislative silence is a poor beacon to follow in discerning the proper statutory route. For here the light illumines two different roads.

*Zuber v. Allen*, 396 U.S. 168, 185, 90 S.Ct. 314, 323, 24 L.Ed.2d 345 (1969).

The failure of the lawmakers to redefine "head of household" is not entitled to controlling consideration, particularly where it does not appear the Congress acted with the challenged administrative interpretation in mind.[21] *Id.* at 193, 90 S.Ct. at 328.

---

plies with the requirement that has been violated. If the household member who committed the violation leaves the household during the period of ineligibility, such household shall no longer be subject to sanction for such violation and, if it is otherwise eligible, may resume participation in the food stamp program, but any other household of which such person thereafter becomes the head of the household shall be ineligible for the balance of the period of ineligibility.
7 U.S.C. § 2015(d)(1)(B)(ii).

20. The regulation promulgated by the Secretary for the purpose of determining the eligibility of a household for food stamp benefits has prescribed:

> [H]ead of household shall be.... [t]he household member (including excluded members) who is the greatest source of earned income in the two months prior to the month of the violation.
> 7 C.F.R. § 273.1(d)(2).

The definition is annexed to the work requirement provisions of the statute by way of C.F.R. § 273.7(n).

> **Voluntary quit.** No household whose head of household voluntarily quit his or her most recent job without good cause shall be eligible for participation in the Program....
> 7 C.F.R. § 273.7(n) (1988).

21. At variance with the legislative history, the Memorandum of Law in support of Motion for Reconsideration at page 5, adds emphasis to the words "primary wage earner".... The emphasis in the opinion, as stated in the legislative history, appears as follows:

> The **House** amendment extends the scope of the existing law disqualifying **applicant**

The Secretary's suggestion that the regulations were transmitted to respective Committees on Agriculture in keeping with 7 U.S.C. § 2013(c) hardly can be said to address the problem at issue here. *Id.* at 185 n. 21, 90 S.Ct. at 324 n. 21.

The "voluntary quit" provision, as the Secretary points out, was included in the comprehensive amendment of 1977 "by simplifying administration, encouraging participation, and eliminating fraud, and for other purposes...." H.R.Rep. No. 464, 95th Cong., 1st Sess. 1 (1977), 1977 U.S. Code Cong. & Admin.News 1978.

With more particularity, the legislative history reports further:

> The Committee bill is a tightly inter-related package of provisions that accomplishes several major objectives:
>
> 1. To tighten program administration and reduce fraud and abuse.
>
> 2. To eliminate the non-needy from the program so that those who do not need food stamps do not get them.
>
> 3. To facilitate the participation of the needy so that those who do need stamps do get them.
>
> 4. To hold program costs close to current program levels.
>
> 5. To simplify administration.
>
> 6. To minimize the loss of benefits to current needy participants.

H.R.Rep. No. 464, 95 Cong., 1st Sess. 2 (1977), 1977 U.S. Code Cong. & Admin. News 1978.

The Senate Committee report, as cited by the defendant, is in accord in stating "increased emphasis in providing benefits to those who are unable to provide for themselves and less to those who have made themselves needy." Sen.Rep. No. 97–504, 97th Cong., 2nd Sess., *reprinted in* 1982 U.S.Code Cong. & Ad.News 1641, 1677.

The facts in this action reveal no fraudulent purpose or suggestion of abuse by intentional freeloading. In eliminating the eligibility of the LePage household, needed benefits were lost; its participation was obstructed, rather than facilitated.

To be sure, the fourth circuit court of appeals found "[t]he Secretary's construction of the statute is reasonable and is not precluded by the statute's language or legislative history." *Wilson v. Lyng, supra,* 856 F.2d at 634. The result seems to be principally based on the premise that "it is administratively most convenient to define the head of a household as its primary wage earner." *Id.* 635.

In the light of the Congressional objectives expressed by the House Committee, to apply to the LePage household the provisions of 7 C.F.R. §§ 273.1(d)(2) and 273.7(n) with the controlling deference observed in *Wilson* would serve administrative expediency at the expense of nutritional benefits to a household in need.[22] The court respectfully declines to follow that aspect of the decision by the appellate court in *Wilson.*

In this circuit "wherever possible, we must interpret the [Food Stamp] Act so that its terms are internally consistent." *Huberman v. Perales,* 884 F.2d 62, 65 (2d Cir.1989). The definition added by the regulation conveys a different meaning to the term "head of household" as used in other provisions of the Act. *Anderson v. Lyng,* 644 F.Supp. 1372, 1378 n. 6 (M.D.Ala.1986). The Secretary's construction of the term is not in harmony with the legislative history. As applied to the households in this action, the challenged regulations restrict, rather than serve, the specific purposes set forth as the major objectives of the 1977 amendments to the Act.

For the reasons stated, the court is not persuaded that its opinion entered Septem-

households for 60 days, if the primary wage earner has voluntarily quit a job without good cause, to include **recipient** households.
H.R.Conf.Rep. No. 377, 97th Cong., 1st Sess. 218 (1981) (emphasis in original), *reprinted in* 1981 U.S.Code Cong. & Ad.News 2250, 2315.

**22.** It is perhaps open to argument whether administrative expediency is better served by the

definition of "primary wage earner" or "(that member in whose name application is made for participation in the program)" as referred to parenthetically in H.R.Rep. No. 464, 95th Cong., 1st Sess. 168, 1977 U.S.Code Cong. & Admin. News, 2138.

318

ber 12, 1989 should be revised to grant the Secretary's motion for summary judgment. The court will enter a declaratory order that the provisions of 7 C.F.R. §§ 273.-1(d)(2) and 273.7(n), as applied to the participation of the plaintiffs' households, are not authorized by the Food Stamp Act of 1977.

It is SO ORDERED.