**Lisa LEPAGE, Beverly Johnson, on behalf of themselves and all others similarly situated, Plaintiffs–Appellees,**

v.

**Clayton YEUTTER, Secretary of the United States Department of Agriculture, and Veronica Celani, Commissioner of Social Welfare, Vermont, Defendants,**

**Clayton Yeutter, Secretary of the United States Department of Agriculture, Defendant–Appellant.**

**No. 36, Docket 90–6043.**

United States Court of Appeals, Second Circuit.

Argued Aug. 28, 1990.

Decided Oct. 30, 1990.

Katherine S. Gruenheck (Barbara C. Biddle, Civ. Div., Dept. of Justice, Washington, D.C., George J. Terwilliger III, U.S. Atty., Burlington, Vt., Stuart M. Gerson, Asst. Atty. Gen., Washington, D.C., on brief), for defendant-appellant.

Thomas F. Garrett (Jack McCullough, Vermont Legal Aid, Inc., Burlington, Vt., on brief), for plaintiffs-appellees.

Before FEINBERG and CARDAMONE, Circuit Judges, and CABRANES, District Judge.*

CABRANES, District Judge:

Plaintiffs-appellees have brought this class action to challenge the validity of

---

* The Honorable José A. Cabranes, United States District Judge for the District of Connecticut, sitting by designation.

certain regulations promulgated by the Secretary of Agriculture (the "Secretary") under the Food Stamp Act of 1977, 7 U.S.C. §§ 2011–2030 (the "Food Stamp Act"). The regulations at issue concern the so-called "voluntary quit" provision of the Food Stamp Act, under which a household is disqualified from receiving food stamps for a period of ninety days if the "head of the household" voluntarily quits his or her employment without good cause. 7 U.S.C. § 2015(d)(1)(B)(ii);[1] 7 C.F.R. § 273.7(n).[2] In particular, plaintiffs-appellees challenge the Secretary's decision to define the term "head of household" as "the primary wage earner" for the purposes of the voluntary quit provision. 7 C.F.R. § 273.1(d)(2).[3]

The facts of this case are not disputed. Lisa Lepage is the mother of three minor children. During the relevant period of this lawsuit, Ms. Lepage did not work outside the home. She received food stamps from the Vermont Department of Social Welfare (the "Department") as well as assistance through the Aid to Families with Dependent Children program, 42 U.S.C. §§ 601–617 ("AFDC"). From December 1986 until March 1988, Carl Hale, an unrelated friend of Ms. Lepage, lived and ate with her family. Mr. Hale worked for a pool construction company in May 1987, and he quit after approximately three weeks. After Ms. Lepage reported the job loss, the Department determined that Mr. Hale had been the primary wage earner of the household and because he quit his job without good cause,[4] her entire household was disqualified for ninety days from receiving food stamps.

1. The Food Stamp Act, as now codified, states in relevant part that

   [u]nless otherwise exempted ...; no household shall be eligible to participate in the food stamp program ... if the head of the household voluntarily quits any job without good cause, but, in such case, the period of ineligibility shall be ninety days.

   7 U.S.C. § 2015(d)(1)(B)(ii).

2. The Secretary's regulation on the "voluntary quit" provision reads as follows:

   No household whose head of household, *as defined in § 273.1(d)(2)*, voluntarily quit a job of 20 hours a week or more without good cause 60 days or less prior to the date of application or at any time thereafter shall be eligible for participation in the program as specified below.

   7 C.F.R. § 273.7(n) (emphasis added).

3. Under the definition section of the food stamp regulations, the Secretary states:

   For purposes of failure to comply with §§ 273.7 [work requirements, which include the regulation concerning "voluntary quit"] and 273.22 [optional workfare program] head of household shall be considered to be the principal wage earner. The principal wage earner shall be the household member (including excluded members) who is the greatest source of earned income in the two months prior to the month of the violation. This provision applies only if the employment involves 20 hours or more per week or provides weekly earnings at least equivalent to the Federal minimum wage multiplied by 20 hours. No person of any age living with a parent or person fulfilling the role of a parent who is registered for work or exempt from work registration requirements because such parent or person fulfilling the role of a parent is subject to and participating in the work incentive program under Title IV of the Social Security Act, or is in receipt of unemployment compensation (or has registered for work as part of the unemployment compensation application process), or is employed or self employed and working a minimum of 30 hours weekly or receiving weekly earnings equal to the Federal minimum wage multiplied by 30 hours shall be considered the head of household. If there is no principal source of earned income in the household, the household may designate the head of household. The designation of head of household through the circumstances of this paragraph shall take precedence over a previous designation of head of household at least until the period of ineligibility is ended.

   7 C.F.R. § 273.1(d)(2).

4. It is worth noting that the Secretary has taken a rather expansive view of what constitutes "good cause" in determining whether a decision to quit one's job will lead to the temporary cessation of food stamp benefits. "Good cause" includes such reasons as discrimination (age, sex, race, handicap, religion, political beliefs, etc.), unreasonable work demands or conditions, acceptance and enrollment in a school or training program, "retirement" as recognized by the employer, or leaving in connection with typical patterns of employment. *See* 7 C.F.R. § 273.7(n)(3).

In 1986, Beverly Johnson lived with her four children, three of whom were minors. Ms. Johnson also received aid through the AFDC program. Although Ms. Johnson worked outside of her home, she earned less than her nineteen-year-old son, John Nichols, who worked for a roofing contractor. In April 1986, Mr. Nichols quit his job. Because of the subsequent loss to the household income, Ms. Johnson applied for food stamps. The Department denied her application based on the determination that Mr. Nichols was the principal wage earner and that he had quit his job without good cause.

The district court granted plaintiffs-appellees' motion for summary judgment and invalidated the regulations. Because we find that the Secretary's regulations do not contravene a clear congressional intention and that they are reasonable in light of his statutory authority to issue such regulations as he deems necessary and appropriate, we now reverse.

## I.

When a court reviews an administrative agency's construction of the statute which the agency administers, the court faces two questions:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, ... the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (footnotes omitted).

In considering the regulations at issue in this case, the district court properly inquired into whether Congress had expressed a clear intention on the meaning of "head of household" for the purposes of the voluntary quit provision. Because the

district court concluded both that Congress intended that the term "head of household" mean "the member of the household who was designated as being responsible for it in the Food Stamp Program" and that this intention was "evident" from the language of the statute and from the legislative history, *Dubuque,* 728 F.Supp. 303, 315 (D.Vt. 1989), it never reached *Chevron's* second question of whether the Secretary's construction of the statute was "reasonable."

## II.

In 1964, Congress enacted the Food Stamp Act "in order to promote the general welfare, [and] to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011. The voluntary quit provision, 7 U.S.C. § 2015(d)(1)(B)(ii), was enacted in 1977 as part of Congress's efforts to "eliminate the non-needy from the program," simplify administration, and reduce fraud and abuse. H.R.Rep. No. 464, 95th Cong., 1st Sess. ("1977 House Report") 1–2, *reprinted in* 1977 U.S.Code Cong. & Admin.News 1978, 1978–79. The provision was intended to remove a perceived loophole in the Food Stamp Act, by preventing an individual from quitting work voluntarily in order to become eligible for food stamps.

Although the voluntary quit provision originally covered only applicants, Congress extended its coverage in 1981 to include households already receiving benefits. Pub.L. No. 97–98, § 1311, 95 Stat. 1213, 1285 (1981). In 1982, the provision was amended to increase the period of ineligibility from sixty to ninety days. Pub.L. No. 97–253, § 158(a), 96 Stat. 763, 777 (1982). In 1985, Congress moved in the opposite direction, amending the Food Stamp Act to limit the consequences to the household of any member's refusing to accept a reasonable job without good cause or to register for employment. Whereas prior to 1985, *any* "physically and mentally fit [household member] between the ages of sixteen and sixty" who refused to accept a job without good cause could disqualify the entire household from receiving food

stamps, after 1985, the entire household could be disqualified *only* when the "head of the household" voluntarily quit his or her job. *See* Food Security Act of 1985, Pub.L. No. 99–198, § 1516, 99 Stat. 1354, 1572–73 (1985); *see also* H.R.Rep. No. 271, Pt. 1, 99th Cong., 1st Sess. 313, *reprinted in* 1985 U.S.Code Cong. & Admin.News 1103, 1417.[5]

Congress did not define the term "head of household" in the original enactment of the voluntary quit provision in 1977. However, for purposes of administering the food stamp program, the Secretary had already defined "head of the household" as the "member of the household in whose name application is made for participation in the [Food Stamp] Program." 29 Fed. Reg. 16784, 16785 (1964). When Congress enacted the voluntary quit provision in 1977, currently codified at 7 U.S.C. § 2015(d)(1)(B)(ii), the House Agriculture Committee apparently had the Secretary's definition of "head of household" in mind when commenting on the loophole in the statute:

> There is no prohibition, however, against the head of a household (*that member in whose name application is made for participation in the program*) ... quitting work and thereby rendering the entire household eligible for food stamps.

1977 House Report at 168, *reprinted in* 1977 U.S.Code Cong. & Admin.News at 2138 (emphasis added).

In 1979, the Secretary promulgated a regulation adopting a specialized definition of "head of household" for purposes of the voluntary quit provision. 7 C.F.R.

§ 273.7(c) (1979). The Secretary determined that defining "head of household" as the "primary wage earner" would best realize Congress's intent to prevent household breadwinners from voluntarily quitting work and then relying on the food stamp program for support. *See* 43 Fed. Reg. 47846, 47853 (1978). When Congress amended the voluntary quit provision in 1981 to apply to households already receiving food stamps, the legislative history acknowledged the Secretary's specialized definition of 1979. The House Conference Report stated the purpose of the provision:

> The *House* amendment extends the scope of the existing law disqualifying *applicant* households for 60 days, if the primary wage earner has voluntarily quit a job without good cause, to include *recipient* households.

H.R.Conf.Rep. No. 377, 97th Cong., 1st Sess. 218, *reprinted in* 1981 U.S.Code Cong. & Admin.News 2250, 2315 (emphasis in original). The report on the Senate's version of the bill was similar:

> Household disqualification, if the *primary wage earner* has voluntarily quit a job without good cause, would be extended to include those already receiving food stamps (only applicants are now disqualified under this rule) and the period of disqualification for voluntarily quitting a job would be lengthened from 60 to 90 days.

S.Rep. No. 128, 97th Cong., 1st Sess. 18 (1981) (emphasis added). All discussions of subsequent amendments to the voluntary quit provision, however, have referred simply to "head of household" without further elaboration.[6]

---

**5.** The 1985 amendment to the Food Stamp Act might partially answer the question that puzzled the panel and went unanswered at oral argument, namely: If the voluntary quit provision was enacted in 1977, why did it take until the late 1980's for someone to challenge the Secretary's regulation in court? It may be that prior to 1985, the precise definition of "head of the household" was less important because the household could have been disqualified had any fit, adult member of the household failed to comply with specified work requirements. It was only when Congress limited the entire household's disqualification to those occasions when the "head of the household" voluntarily

quits his or her job that so much attention began to be focused on the Secretary's definition.

**6.** *See, e.g.,* H.R.Rep. No. 271, Pt. 1, 99th Cong., 1st Sess. 313, *reprinted in* 1985 U.S.Code Cong. & Admin.News 1103, 1417 (discussing amendment, which was adopted, that limited disqualification of household only to those circumstances where "head of household" voluntarily quit), *see supra* note 5; S.Rep. No. 504, 97th Cong., 2d Sess. ("1982 Senate Report") 38, *reprinted in* 1982 U.S.Code Cong. & Admin.News 1641, 1728 (discussing amendment that increased disqualification period from 60 to 90

After reviewing this history of congressional consideration of the Food Stamp Act, the district court first recognized that the term "head of household," as used in the Food Stamp Act, did not "convey a plain or commonplace meaning" and that it "depart[ed] from the general[,] accepted and traditional meaning." *Dubuque*, 728 F.Supp. at 310 & n. 11. In those circumstances, it was indeed proper for the court to turn to the legislative history to determine whether Congress had expressed an intention on this issue. *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984) (where "resolution of a question of federal law turns on a statute and the intention of Congress, [the court] look[s] first to the statutory language and then to the legislative history if the statutory language is unclear"). Upon reviewing the legislative history, the district court found that

> Congress's intention that "head of the household" mean the member of the household who was designated as being responsible for it in the Food Stamp Program is evident from the legislative history in conjunction with the language of 7 U.S.C. § 2015(d). The Secretary's regulation engrafts a new meaning which is contrary to that intention.

*Dubuque*, 728 F.Supp. at 315.

However, the two courts of appeals that have addressed this precise issue have reached the opposite conclusion. They both found that congressional intent was not clear enough to make it unnecessary to reach the question of whether or not the Secretary's regulation was reasonable. In *Wilson v. Lyng*, 856 F.2d 630 (4th Cir. 1988), the Fourth Circuit concluded that Congress had not clearly articulated an intent as to the definition of "head of the household" in the Food Stamp Act and that the Secretary's regulation is based on a permissible construction of the statute. In *Verna v. Coler*, 710 F.Supp. 1339, 1342 (S.D.Fla.1989), *aff'd*, 893 F.2d 1238 (11th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 64, 112 L.Ed.2d 38 (1990), the district court

had held that "the voluntary quit regulation is valid as a permissible construction of the Act in the exercise of the Secretary's delegated powers." The Eleventh Circuit affirmed in a *per curiam* opinion, adopting the district court's opinion as the "opinion of this court." *Verna v. Coler*, 893 F.2d at 1238.

The intent of Congress on the precise meaning of "head of the household" as used in the voluntary quit provision is far from clear. It is true, of course, that Congress's statements of purpose in amending the voluntary quit provision in 1981, which refer to "principal wage earner," are entitled to "great weight in statutory construction." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). But the 1977 parenthetical reference to head of household as "that member in whose name application is made for participation in the program," 1977 House Report at 168, *reprinted in* 1977 U.S.Code Cong. & Admin.News at 2138, suggests that when the original voluntary quit provision was enacted, either Congress explicitly intended "head of the household" to mean the food stamp applicant or it wished simply to acknowledge what had been the Secretary's regulation since the beginning of the program. Whatever else may be said of Congress's intentions between 1977 and 1981, they were not sufficiently clear to "end ... the matter." *Chevron*, 467 U.S. at 842, 104 S.Ct. at 2781.

### III.

Under the Food Stamp Act as enacted in 1964, the Secretary is authorized to "issue such regulations consistent with [the Food Stamp Act] as [he] deems necessary or appropriate...." 7 U.S.C. § 2013(c). It was therefore entirely appropriate for the Secretary, in 1979, to redefine the term "head of household" in light of the voluntary quit provision enacted in 1977.[7] The specialized definition was based upon an extensive rulemaking record and thorough deliberation. *See* 43 Fed.Reg. 47846, 47853

---

days for "participating households where heads voluntarily quit a job").

7. *See supra* note 1.

(1978) (Secretary reporting on the criticisms made by approximately 300 commentators); 43 Fed.Reg. 54253, 54254 (1978) (proposal of new rule and request for comments); 44 Fed.Reg. 17982, 17983–84 (1979) (Secretary's comments after reading over 120 letters on suggested revisions to voluntary quit provision).

To be found "reasonable," the Secretary's definition must further the goals of the Food Stamp Act. While the purpose of the Act itself is to "alleviate ... hunger and malnutrition [and to] ... permit low-income households to obtain a more nutritious diet through normal channels of trade," 7 U.S.C. § 2011, Congress has recognized that the voluntary quit provision involves a refinement or narrowing of the originally stated goals of the statute. *See* 1982 Senate Report at 112, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 1677 (voluntary quit sanction intended to provide more emphasis on delivering "benefits to those who are unable to provide for themselves and less to those ... who have *made* themselves 'needy'") (emphasis in original).

To achieve those purposes, the Secretary promulgated a regulation that encourages the employed to remain working and to exclude from the program those households that are self-sufficient. By creating a period of ineligibility, Congress sought to remove a possible incentive to quit. It was reasonable, under the circumstances, for the Secretary, in applying the statute, to conclude that defining "head of household" to mean the primary wage earner rather than the food stamp applicant would better serve the purposes of the voluntary quit provision. It places the incentives on the one whose continued employment would be most important to the financial well-being of the household. By using the "primary wage earner" definition, the Secretary's regulation maximizes the funds available to the truly needy. 1977 House Report at 2, *reprinted in* 1977 U.S.Code Cong. & Admin.News at 1978.[8]

Plaintiffs-appellees suggest that placing the incentive on the principal wage earner would be a mistake because this individual may be one over whom the household "has no control" and one who has no legal or moral duty to provide for the other members of the household. Of course, the principal wage earner must still be a member of the "household," defined in the Act as "a group of individuals who live together and customarily purchase food and prepare meals together for home consumption," 7 U.S.C. § 2012(i)(2). The principal wage earner is no stranger to the household, and it is reasonable to assume that the principal wage earner would ordinarily take some responsibility for the well-being of the other members. Moreover, the statute defines "household" in terms of individuals who do not necessarily owe any moral or legal responsibility towards one another. *See id.* Thus, even plaintiffs-appellees' preferred definition of "head of household"—*i.e.*, the applicant for food stamps—does not necessarily describe one over whom the other members of the "household" have any legal or moral control.

8. There is nothing new, of course, in this legislative and administrative effort to distinguish between the "deserving" and the "undeserving" poor. The definition and re-definition of poverty and the closely related questions of eligibility for public support or maintenance have been a central concern of moral philosophy and political economy in England and much of the rest of the Western world for the past two-hundred years. The historian Gertrude Himmelfarb has traced the history of the "idea of poverty" in England from the late eighteenth century through the mid-nineteenth century. G. Himmelfarb, *The Idea of Poverty: England in the Early Industrial Age* (1983). *See id.* at 8 (discussing development of concept of " 'unworthy,' 'undeserving' poor [as] distinguished from the 'worthy' and 'deserving' "); *id.* at 149 (quoting from Alexis de Tocqueville's *Memoir on Pauperism* in which he writes that " '[n]othing is so difficult to distinguish as the nuances which separate unmerited misfortune from an adversity produced by vice' "); *id.* at 526–27 (discussing various would-be reformers' intentions to "re-moralize" the poor).

In its own way, the enactment of the voluntary quit provision of the Food Stamp Act is a small part of the twentieth century's struggle with what the nineteenth century referred to as " '[t]he mischievous ambiguity of the word *poor*,' " *id.* at 523 (emphasis in original) (quoting *Report from His Majesty's Commissioners for Inquiring into the Administration and Practical Operation of the Poor Laws* 156 (1834)).

747

The plaintiffs-appellees contend, and the record in this case suggests, that this definition may occasionally lead to arguably unfair results. Nevertheless, the "primary wage earner" definition in the regulation promotes the purpose of the voluntary quit provision of the statute to prohibit the head of the household from "quitting work and thereby rendering the entire household eligible for food stamps." 1977 House Report at 168, *reprinted in* 1977 U.S.Code Cong. & Admin.News at 2138. The Secretary's regulation is thus reasonable, and since it is not precluded by the statute's language or legislative history, we must uphold it.

### Conclusion

For the reasons stated above, the judgment of the district court is reversed, and the cause is remanded for the entry of judgment for the defendant-appellant.