946 F.2d 4
 MAINE ASSOCIATION OF INTERDEPENDENT NEIGHBORHOODS, et al.,
Plaintiffs, Appellees,
v.
COMMISSIONER, MAINE DEPARTMENT OF HUMAN SERVICES, Defendant, Appellee,
Clayton Yeutter, Secretary, United States Department of
Agriculture, Defendant, Appellant.
 No. 91-1275.
 United States Court of Appeals,
First Circuit.
 Heard July 30, 1991.
Decided Sept. 27, 1991.
 
 Richard A. Olderman, Atty., Appellate Staff, Civ. Div., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Richard S. Cohen, U.S. Atty., and Barbara C. Biddle, Atty., Appellate Staff, Civil Div., Dept. of Justice, were on brief, for defendant, appellant.
 Jack Comart, with whom Marina E. Thibeau, Asst. Atty. Gen., Dept. of Human Services, Patrick Ende and Pine Tree Legal Assistance, Inc., were on brief, for plaintiffs, appellees.
 Before TORRUELLA and SELYA, Circuit Judges, and YOUNG,* District Judge.
 TORRUELLA, Circuit Judge.
 
 
 1
 This court must decide whether a Department of Agriculture regulation that defines the term "head of household" for purposes of the Food Stamp Act's "voluntary quit" rule is compatible with that statute. The Maine Association of Independent Neighborhoods ("MAIN") originally filed this action against the Maine Department of Human Services in Maine state court. The case was then removed to the United States District Court for the District of Maine, and a third party complaint was filed against the United States Secretary of Agriculture (the "Secretary"). On cross-motions for summary judgment, the district court ruled that the Secretary's "head of household" definition was inconsistent with the Food Stamp Act and thus invalid, 732 F.Supp. 248 (1990).[1] We reverse.
 
 I.
 
 2
 The Food Stamp Act, 7 U.S.C. §§ 2011-2025, was enacted in 1964 "to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011. Congress has amended the Act several times with the goal of ensuring that benefits go to those who truly need them--and not to those who do not. See Lepage v. Yeutter, 917 F.2d 741, 746 & n. 8 (2d Cir.1990). The voluntary quit rule arose from just such an amendment. Added to the Food Stamp Act in 1977, the rule disqualifies households from receiving their food stamp allotment if the "head of household" voluntarily leaves a job without good cause. 7 U.S.C. § 2015(d)(1)(B)(ii).
 
 
 3
 Originally the voluntary quit rule applied only to new food stamp applicants, but in 1981 Congress expanded the disqualification to households already receiving food stamps. Pub.L. No. 97-98 § 1311, 95 Stat. 1213, 1285 (1981). The rule was broadened further by a 1982 amendment increasing the suspension period from 60 to 90 days. Pub.L. No. 97-253, § 158(a), 96 Stat. 763, 777 (1982). Most recently, in 1990 Congress amended the statute to provide that a household could designate its own head under certain circumstances.[2] Pub.L. No. 101-624, Title XVII, § 1725, 104 Stat. 3359, 3787 (1990). The 1990 amendment is prospective only and thus does not directly affect this litigation; however, it is, as we shall see, of some relevance in our analysis of the "head of household" regulation.
 
 
 4
 For purposes of this case, the voluntary quit rule provides that:
 
 
 5
 [N]o household shall be eligible to participate in the food stamp program ... if the head of household voluntarily quits any job without good cause, but, in such case, the period of ineligibility shall be ninety days.
 
 
 6
 7 U.S.C. § 2015(d)(1)(B)(ii). The statute does not define "head of household."
 
 
 7
 The Food Stamp Act authorizes the Secretary to "issue such regulations consistent with this chapter as the Secretary deems necessary or appropriate for the effective and efficient administration of the food stamp program." 7 U.S.C. § 2013(c). Prior to 1977, the Secretary defined "head of household" as the "member of the household in whose name application is made for participation in the [Food Stamp] Program." 29 Fed.Reg. 16784, 16785 (1964). Upon enactment of the voluntary quit rule, the Secretary determined that the old definition did not serve the goals of the new rule, and in 1979 a new regulation was promulgated. Under this regulation, states were free to define "head of household" as they chose, for certain administrative purposes. But, for purposes of the voluntary quit rule, "head of household" was defined as "primary wage earner." 43 Fed.Reg. 47,846, 47,853 (1978).[3] It is this definition of "head of household" that is the subject of the present dispute.
 
 II.
 
 8
 Judicial review of an agency regulation proceeds under the analysis established by Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). We first determine if Congress has spoken to the precise question at issue (what is a "head of household"?). At this stage we look to "the statute's language, history and purpose." Massachusetts v. Lyng, 893 F.2d 424, 429 (1st Cir.1990). If congressional intent is clear, we simply give effect to that intent. If, however, we are unable to divine a clear intent, we must then decide if the regulation "is based on a permissible construction of the statute." Chevron, 467 U.S. at 843, 104 S.Ct. at 2782. Generally, agency regulations are entitled to deference "unless they are arbitrary, capricious, or manifestly contrary to the statute." Id. at 844, 104 S.Ct. at 2782.
 
 A. Intent
 
 9
 The Food Stamp Act does not define "head of household," so we must search beyond the language of the statute to ascertain Congress's intent, if any. Looking to legislative history, we find several--conflicting--signals.
 
 
 10
 Most helpful to MAIN's position is a statement in a 1977 House Report explaining the potential abuse at which the voluntary quit rule was aimed:
 
 
 11
 There is no prohibition, however, against the head of a household (that member in whose name application is made for participation in the program ) ... quitting work and thereby rendering the entire household eligible for food stamps.
 
 
 12
 H.R.Rep. No. 464, 95th Cong., 1st Sess. ("1977 House Report") 1-2, reprinted in 1977 U.S.Code Cong. & Admin.News 1704, 1978, 2138 (emphasis added). According to MAIN, this statement indicates that when Congress adopted the voluntary quit rule, it intended to incorporate the pre-existing definition of "head of household."
 
 
 13
 Although MAIN's reading of the 1977 House Report is certainly possible, we do not think it conclusive. First, the Report does not expressly adopt the old "head of household" definition, but merely references it. Such a parenthetical acknowledgment seems to us an ambiguous indication of congressional intent, certainly short of the statement of clear intent we seek under Chevron.
 
 
 14
 Moreover, later congressional comments undercut the significance of this passing, albeit contemporaneous, reference to the old definition. Of course, "isolated statements by individual Members of Congress or its committees, all made after the enactment of the statute under consideration, cannot substitute for a clear expression of legislative intent at the time of enactment." Southeastern Community College v. Davis, 442 U.S. 397, 411 n. 11, 99 S.Ct. 2361, 2370 n. 11, 60 L.Ed.2d 980 (1979). Here, however, we do not use these later remarks as a substitute for clearly expressed intent, but merely as an aid in determining if such an expression exists. And we find, most notably, that in explaining the purpose of the 1981 extension of the voluntary quit rule, both houses of Congress used the Secretary's revised "head of household" definition. The Conference Report stated:
 
 
 15
 The House amendment extends the scope of the existing law disqualifying applicant households for 60 days, if the primary wage earner has voluntarily quit a job without good cause, to include recipient households.
 
 
 16
 H.R. Conf.Rep. No. 377, 97th Cong., 1st Sess. 218, reprinted in 1981 U.S.Code Cong. & Admin.News 1965, 2250, 2315 (emphasis added). Similarly, the Senate Report provided:
 
 
 17
 Household disqualification, if the primary wage earner has voluntarily quit a job without good cause, would be extended to include those already receiving food stamps (only applicants are now disqualified under this rule) and the period of disqualification for voluntarily quitting a job would be lengthened.
 
 
 18
 S.Rep. No. 97-128, 97th Cong., 1st Sess. 18 (emphasis added).
 
 
 19
 Like the 1977 House Report, these Reports are not conclusive indicators of congressional intent. Rather, taken together with the earlier Report, they show that most likely Congress did not consider an appropriate definition of "head of household" when enacting the voluntary quit rule, or if it did, it failed to express it plainly.
 
 
 20
 MAIN also relies upon the 1990 amendment to the voluntary quit rule, in which Congress allowed certain households to designate their own heads. MAIN contends that the amendment amounts to affirmative action rejecting the Secretary's regulation. "Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction." Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 380-81, 89 S.Ct. 1794, 1801-02, 23 L.Ed.2d 371 (1969). But the amendment does not overrule the Secretary's definition, it supplements it. The "head of household" will still be the primary wage earner if a household fails to, chooses not to, or cannot designate its head. It appears to us that the amendment acts as a sort of safety valve. It alleviates the potential for unfairness in the "primary wage earner" definition that several courts, including the court below, have noted,[4] while keeping intact the Secretary's regulation. Taken as a whole, we cannot discern clear congressional intent from the legislative history.
 
 
 21
 The purpose of the Food Stamp Act generally, and the voluntary quit rule in particular, is the third focus of our search for congressional intent. See Massachusetts v. Lyng, 893 F.2d at 429. We agree with the Second Circuit's assessment: "While the purpose of the Act itself is to 'alleviate ... hunger and malnutrition [and to] ... permit low-income households to obtain a more nutritious diet through normal channels of trade,' Congress has recognized that the voluntary quit provision involves a refinement or narrowing of the originally stated goals of the statute." Lepage v. Yeutter, 917 F.2d at 746 (citations omitted). This twofold goal of providing the maximum possible "benefits to those who are unable to provide for themselves and less to those ... who have made themselves 'needy,' " 1982 Senate Report at 38, reprinted in 1982 U.S.Code Cong. & Admin.News 1641 at 1677 (emphasis in original), appears to be the purpose of the voluntary quit rule, but it does not shed light on an intended definition of the term "head of household." Like the language and the history of the provision, its purpose is inconclusive. We find that Congress did not express a clear intent as to the definition of "head of household." We move, therefore, to the second step of the Chevron analysis.
 
 B. Permissible construction
 
 22
 We have no difficulty concluding that the Secretary's definition is based upon a permissible construction of the Food Stamp Act. The final "head of household" definition rested on an extensive notice and comment procedure, in which the Secretary received and reacted to more than 300 comments. See 43 Fed.Reg. 47846, 47853 (1978); 43 Fed.Reg. 54253, 54254 (1978); 44 Fed.Reg. 17982, 17983-84 (1979). The proposed regulations were submitted to Congress with an explanatory statement, as required by the Food Stamp Act. See 7 U.S.C. § 2013(c). As the Fourth Circuit concluded, "[t]here is every reason to believe that this process [was] as responsive to the competing considerations embodied in the regulations as litigation could be." Wilson v. Lyng, 856 F.2d 630, 636 (4th Cir.1988).
 
 
 23
 Finally, the regulation is a reasonable effort to implement the new voluntary quit rule. The Secretary formulated the definition with the realization that in today's household, the primary decision maker and the primary wage earner might not be the same person. To define "head of household" as had been done in the past would leave open the loophole Congress sought to close with the voluntary quit provision--the intentional impoverishment of the household. As the Secretary explained in proposing the new definition:
 
 
 24
 This statutory disqualification [the voluntary quit rule] places new importance on the definition of household head. The Congressional purpose is to prevent the family breadwinner from voluntarily quitting work and then immediately relying on the program for support. The Department's proposed head of household definition enforces that purpose.
 
 
 25
 43 Fed.Reg. 18879 (1978). In sum, the regulation is a reasonable way to maximize benefits to the truly needy.
 
 III.
 
 26
 The three Circuit Courts of Appeals that have faced this question have reached the same conclusion we do here. See Lepage v. Yeutter, 917 F.2d 741; Verna v. Coler, 893 F.2d 1238 (11th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 64, 112 L.Ed.2d 38 (1990); Wilson v. Lyng, 856 F.2d 630. The only difference between those courts' consideration and ours is the 1990 amendment to the Food Stamp Act. As we indicate above, however, that amendment is not directly applicable to the present case, and it does not sufficiently clarify congressional intent to change our result. We therefore join our sister circuits in holding that the Secretary's "head of household" definition is based on a permissible construction of the Food Stamp Act in the face of congressional silence.
 
 
 27
 The district court judgment invalidating the regulation is reversed.
 
 
 
 *
 Of the District of Massachusetts, sitting by designation
 
 
 [1]
 The district court also ruled that MAIN had associational standing to challenge the regulation, and it upheld a second regulation. Those rulings have not been appealed
 
 
 [2]
 The new amendment, which is to be inserted immediately following the existing voluntary quit rule, provides in full:
 The State agency shall allow the household to select an adult parent of children in the household as its head where all adult household members making application agree to the selection. The household may designate its head of household under this paragraph each time the household is certified for participation in the food stamp program, but may not change the designation during a certification period unless there is a change in the composition of the household.
 Pub.L. No. 101-624, Title XVII, § 1725, 104 Stat. 3787 (1990).
 
 
 [3]
 The "primary wage earner" was subsequently defined as "that household member age 18 or over who was acquiring the greatest amount of earned financial support for the household at the time of the quit." 43 Fed.Reg. 54,253, 54,254 (1978); 44 Fed.Reg. 17,982, 17,983-84 (1979)
 
 
 [4]
 See DuBuque v. Yeutter, 728 F.Supp. 303, 313 (D.Vt.1989), reversed, Lepage v. Yeutter, 917 F.2d 741 (2d Cir.1990); Wilson v. Lyng, 662 F.Supp. 1391, 1395 (E.D.N.C.1987), reversed, 856 F.2d 630 (4th Cir.1988); Anderson v. Lyng, 644 F.Supp. 1372, 1379-80 (M.D.Ala.1986), overruled, Verna v. Coler, 893 F.2d 1238 (11th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 64, 112 L.Ed.2d 38 (1990)